## UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF TENNESSEE
## NASHVILLE DIVISION

**CHARLES CARROLL,**

      **Plaintiff,**

**v.**

**IDEMIA IDENTITY AND SECURITY USA LLC,**

      **Defendant.**

**Case No**. _____

**Judge**

**JURY DEMAND**

## COMPLAINT

Plaintiff Charles Carroll ("Plaintiff" or "Mr. Carroll") worked without incident and with tremendous success for Defendant Idemia Identity and Security USA, LLC ("IDEMIA" or "Company") and its predecessors, for approximately twenty years until his unlawful termination in November 2019. In 2014, Mr. Carroll was diagnosed with cancer, but he continued to work without issue until IDEMIA hired Ed Casey as the CEO of IDEMIA North America. Shortly after disclosing his diagnosis to Mr. Casey, Mr. Carroll's ability to do his job given his cancer diagnosis and age began to be questioned by Mr. Casey. The scrutiny intensified beyond just verbal remarks and Mr. Casey started to disrupt Mr. Carroll's ability to perform his job by removing job duties, eventually pushing him into an ill-defined role: the head of a new "Citizen Services" unit—with a vastly reduced team and scope of authority—or given to Hobson's choice to get out. This new position required Mr. Carroll to execute a new contract, one laden with restrictive covenants and non-compete clauses. Shortly after Mr. Carroll signed the new employment contract, however, Mr. Casey reneged on his promises and stonewalled Mr. Carroll's progress on his projects at every turn. Mr. Casey also began excluding Mr. Carroll from important meetings in an effort to diminish his role and visibility within the Company even further. Just three months after signing the contract, on November 7, 2019, Mr.

Casey called Mr. Carroll and told him "they" (*i.e.*, IDEMIA) wanted to "go in a separate direction." IDEMIA raised *no* substantive concerns related to Mr. Carroll's performance, management, or conduct. This action seeks to remedy violations the Americans with Disabilities Act Amendments Act ("ADAAA"), 42 U.S.C. § 12101, *et seq.*; of the Age Discrimination in Employment Act ("ADEA"), 29 U.S.C. § 621, *et seq.*; the False Claims Act ("FCA"), 31 U.S.C. § 3729-3733; as well as common law claims for breach of contract.

## JURISDICTION AND VENUE

1.     This Court has subject matter jurisdiction over the claims asserted in this action pursuant to 28 U.S.C. § 1331 because the action arises under the ADEA, ADAAA, and FCA—all federal statutes.  The Court has supplemental jurisdiction over the state law and common law claims pursuant to 28 U.S.C. § 1367.

2.     Mr. Carroll has properly exhausted his administrative remedies. He filed his charge with the EEOC on September 2, 2020, less than 300 days following the discriminatory termination, and received his right to sue notice on August 11, 2021, less than 90 days before filing this complaint.

3.     Defendant IDEMIA is subject to the personal jurisdiction of this Court as a corporation conducting substantial and continuous commercial activities in Tennessee.  This case arises from IDEMIA's wrongful conduct in Franklin, Tennessee, where IDEMIA employed Mr. Carroll. Throughout his employment with IDEMIA and its predecessor corporations, Mr. Carroll worked and operated his unit out of the Franklin, Tennessee office.

4.     Venue is proper in this District pursuant to 28 U.S.C. § 1391(b)(1) and (2).  A substantial part of the events and omissions giving rise to Mr. Carroll's claims occurred in this District.  Additionally, IDEMIA resides in this District under § 1391(c) because IDEMIA is subject to this Court's personal jurisdiction with respect to this civil action.

2

## THE PARTIES

5.      Plaintiff CHARLES CARROLL ("Plaintiff" or "Mr. Carroll") resides in Nashville, Tennessee. Mr. Carroll worked continuously as the head of his business unit from its inception in 1999. He continued to operate his unit throughout various acquisitions and mergers by and between IDEMIA's predecessor corporations. Upon IDEMIA's creation in 2017, IDEMIA selected Mr. Carroll as its Senior Vice President of Enrollment Services, providing him continued leadership of his business unit.  He served in this position until July 2019, at which time IDEMIA moved Mr. Carroll into a new role as the head of "Citizen Services."  IDEMIA ultimately terminated Mr. Carroll in November 2019.

6.      Defendant IDEMIA IDENTITY AND SECURITY USA LLC ("IDEMIA" or "Company") is a corporation headquartered in Reston, Virginia.  IDEMIA IDENTITY AND SECURITY USA LLC is a subsidiary of IDEMIA Group, a multinational company headquartered in France.  IDEMIA Group and its subsidiaries are owned by their Parent company ADVENT INTERNATIONAL, a private equity firm headquartered in Boston, Massachusetts.

## FACTUAL ALLEGATIONS

I.      **Mr. Carroll Had an Unblemished and Highly Regarded Career at IDEMIA, its Predecessor Companies, and the Identity and Security Industry Writ Large**

7.      Mr. Carroll has had a successful career in the identity and security industry spanning decades. Drawing on his long history of service as a law enforcement official, Mr. Carroll sought to address shortcomings he saw in the field of biometric identification.

8.      Prior to joining IDEMIA, Mr. Carroll founded the company Integrated Biometric Technology in 2000 and quickly established himself as a trailblazer in the industry, pioneering the use of live scan fingerprinting and digitization. Mr. Carroll's innovations, among other things, drastically reduced the time required to run routine background checks, which, in turn, garnered numerous government contracts.

3

9.      Due to this success, larger players within the Identity and Security industry acquired Mr. Carroll's company, which then changed hands through a series of corporate mergers and acquisitions over the decade, ultimately becoming IDEMIA in 2017.[1] While the company's name and corporate structure changed over time, Mr. Carroll continued successfully running his Business Unit with his establish and loyal team out of the Franklin, Tennessee office.

10.     Along the way, Mr. Carroll developed a well-earned reputation as a scrupulously honest, hard-working leader. He developed sophisticated but pragmatic solutions that addressed the needs of government and private sectors. This, coupled with his credibility and unimpeachable honesty garnered him favorable standing with clients, who could trust in both Mr. Carroll's word and work product, which resulted in Mr. Carroll bringing in numerous lucrative contracts.

11.     For instance, in 2014, Mr. Carroll took his technology for the capture, digitization, analysis, storage, and transit of biometric to the Department of Homeland Security, where it was used as the foundation for the federal government's Universal Enrollment Services ("UES2") contract. This contract included the Transportation Security Agency's ("TSA") then-new PreCheck program—one that is now widely adopted and used across the country. Mr. Carroll not only won the UES2 contract; under his leadership, and with the assistance of his technology, TSA PreCheck went from fewer than 500 enrollments per day to *over 16,000 per day*—an increase of *over 3,000%.*

**Mr. Carroll Continued His Successes at IDEMIA**

12.     Upon IDEMIA's creation in 2017, IDEMIA selected Mr. Carroll as its Senior Vice President of Enrollment Services, serving in largely the same role as he had within the Company's previous iterations: head of his Enrollment Services Business Unit.

---

[1] In 2005, Mr. Carroll sold ownership of his business unit to L-1 Identity Solutions. L-1 was then acquired by French defense company Safran in 2011, under which Mr. Carroll's unit became a part of Morpho, Safran's Identity & Security division, primarily contained within MorphoTrust USA Inc. In 2017, Morpho was sold to Advent International and merged with Oberthur Technologies to form what is now known as IDEMIA. Given the shifting corporate identities over time, research over time may reveal additional corporate and/or individual Defendants in Mr. Carroll's action

13.     Mr. Carroll's Business Unit was the most financially successful and profitable division in all of IDEMIA.  In fact, at the time IDEMIA was formed, Mr. Carroll's unit represented nearly *half* of the Company's revenue from the North American market.

14.     Mr. Carroll also continued to innovate new solutions to problems within the industry by bring biometric security technology to the entertainment industry. In 2017, Mr. Carroll conceived of and began developing "Trusted Fan," a program configured to allow customers to use biometrics, such as their fingerprints, to bypass the long bag check, personal search, and concession stand lines at sporting events and large entertainment venues, in exchange for a subscription fee and initial background check.

15.     IDEMIA designated Mr. Carroll's Trusted Fan program as a cornerstone of its Value Creation Plan, a program designed to prioritize promising, quickly growing units to help facilitate IDEMIA's planned Initial Public Offering.

16.     In February 2019, in recognition of Mr. Carroll's unmatched success and innovation, IDEMIA presented Mr. Carroll with the Employee of the Year award and presented his Enrollment Services unit with the Company's Business Unit of the Year award.

17.     Following Mr. Carroll's receipt of these awards, Yann Delabriére, IDEMIA Group's CEO and Board Chairman, visited the Enrollment Services unit and reiterated how impressed he was with Mr. Carroll's operation.

18.     Mr. Carroll received consistently positive feedback and performance reviews throughout his career and during his time with IDEMIA.  He received his most recent overall positive performance review in January 2019, the same year that IDEMIA terminated him.

**II.     IDEMIA's CEO Ed Casey Learned of Mr. Carroll's Cancer Diagnosis and Treatment, and Promptly Began His Efforts to Diminish Mr. Carroll's Authority and Force Him Out.**

19.     Ed Casey was hired as CEO of IDEMIA's North America Identity & Security business in January 2018.

20.    In Spring 2018, Mr. Carroll confided in Mr. Casey that he had cancer and had been undergoing treatment since 2014.  Mr. Carroll informed Mr. Casey that the diagnosis had caused no disruptions in the business over the past four years, and assured Mr. Casey that he would let Mr. Casey know should his medical condition ever interfere with his work performance.

21.    After learning about Mr. Carroll's medical condition, Mr. Casey started placing undue scrutiny on Mr. Carroll's health status and began removing duties and responsibilities from Mr. Carroll, citing his concerns and misgivings about Mr. Carroll's health.

22.    For instance, in March 2019, Mr. Carroll planned to take one of his regular trips to Germany to receive a specialized medical treatment. He had taken such trips previously without any interference in his ability to perform, and excel at, his job. Indeed, as the subsidiary of a French corporation, IDEMIA allowed and often *required* international travel, telework, and video conferencing. Mr. Carroll had previously attended Company meetings remotely without issue, all with Mr. Casey's knowledge and approval.

23.    Mr. Carroll's ability to work remotely while receiving medical treatment proved to be no different than his ability to work remotely while travelling for any number of other reasons.

24.    Before his planned trip to Germany, however, Mr. Casey sent a text message to Mr. Carroll instructing that another employee would be taking over some of Mr. Carroll's responsibilities given his "upcoming trip to Germany and everything related to that," referring to Mr. Carroll's health and relevant treatments. Mr. Casey claimed that Mr. Carroll just had "too much on [his] plate" and he hoped Mr. Carroll would "agree or at least understand."

25.    Mr. Casey subsequently failed to restore these job responsibilities to Mr. Carroll, even after Mr. Carroll cancelled his trip to Germany to take care of important Trusted Fan negotiations.

26.    At no point did Mr. Casey identify any specific concerns with Mr. Carroll's

6

performance or give any indication that Mr. Carroll had been performing inadequately.

27.     The removal of job duties and comments were not an isolated incident. Mr. Casey routinely peppered Mr. Carroll with inquiries regarding his health and cancer treatments, even while Mr. Carroll attempted to steer the conversation back to work. Mr. Casey then used these inquiries as justification to remove even more of Mr. Carroll's duties and responsibilities.

28.     Mr. Casey's interest in Mr. Carroll's health progressed to the point that one-on-one meetings, email exchanges and text exchanges between the two almost always included some line of questioning concerning Mr. Carroll's health and treatment.

29.     Mr. Casey tried to justify these questions as part of his management, rationalizing that any surprise turns in Mr. Carroll's health would make Mr. Casey look bad to IDEMIA's Group CEO, Yann Delabrière.

30.     The intrusive line of questioning continued through the summer and into October 2019, with Mr. Casey routinely raising concerns about Mr. Carroll's ability to continue running his business given that he had cancer.

31.     Mr. Casey's vague concerns never included any specifics or examples regarding Mr. Carroll's performance or supposed shortcomings. Instead, Mr. Casey reflected generalized presumptions about Mr. Carroll's ability to perform while also having cancer.

32.     Mr. Casey's improper assumptions concerning Mr. Carroll's ability to perform were not limited exclusively to his health, but also extended to Mr. Carroll's age.

33.     After assuming the CEO role, Mr. Casey started regularly asking Mr. Carroll why he was still interested in "doing the heavy lifting at [his] age."

34.     Mr. Carroll was not the only target of scrutiny based on discriminatory assumptions about age.

35.     In executive meetings, Mr. Casey often made direct comments about his desire for a

younger workforce. During one meeting concerning employee benefits, Mr. Casey implored leadership to "admit we have an aging workforce" and highlighted the additional cost of providing healthcare to older employees. Mr. Casey also indicated that he viewed IDEMIA's older workforce as a "problem" to be solved.

36. Mr. Casey put his desired solution to that "problem" into practice whenever he had the opportunity, almost exclusively hiring employees under the age of 50, while shepherding out a significant number of employees over the age of 50.

**Mr. Casey Sidelined Mr. Carroll, and Ultimately Terminated Him, Based on Discriminatory Presumptions About Mr. Carroll's Ability to Perform**

37. Beginning in 2019, Mr. Casey's intrusive questions and presumptions turned into more concrete, adverse actions.

38. Mr. Casey began suggesting that Mr. Carroll take a step back and cede control of both the Enrollment Services division, responsible for overseeing UES2 implementation among other enrollment services, as well as his responsibilities for Trusted Fan.

39. In order to facilitate his scheme, Mr. Casey created a new position, Senior Vice President of Corporate Development, that he tried to convince Mr. Carroll to take.

40. Mr. Carroll was wary of the offer despite its lofty title and increased compensation. Not only was the role ill-defined and outside of Mr. Carroll's area of expertise, but Mr. Carroll also recognized the position as a means to an end in removing him from his leadership over Enrollment Services. Mr. Carroll ultimately declined the role, recognizing that Mr. Casey had a vested interest in ensuring that Mr. Carroll remain while the Company was in the midst of the UES2 contract recompete bid.

41. Mr. Casey modified his proposal in May 2019. He firmly suggested that Mr. Carroll should take responsibility over either TSA Pre-Check *or* Trusted Fan, despite the combined Enrollment Services unit's continued high performance under Mr. Carroll's leadership.

42.     Mr. Casey's suggestion, once again, came with no indication of concerns with Mr. Carroll's performance—nor could it. Mr. Carroll's unit was not only performing well, it was poised to secure yet another multi-million dollar contract. Instead, Mr. Casey pitched this as a promotion of sorts, offering significant additional compensation and bonuses.

43.     On June 10, 2019, Mr. Casey sent a text message to Mr. Carroll claiming that he overheard Mr. Carroll's assistant mention to someone else that Mr. Carroll would be "out the next two weeks" and asked if Mr. Carroll was going to Germany.  Mr. Carroll explained that this was not yet confirmed and that he would not be traveling unless and until everything was on track with Trusted Fan, and then tried to steer the conversation back to work. Mr. Casey emphasized that Mr. Carroll should go to Germany when he could, and that the Company could cover while he was away.

44.      As Mr. Carroll had previously explained, he assured Mr. Casey that regardless of any travel, he would still be available and working—just as he did during his many other, non-health related travels.

45.     The day after "overhearing" that Mr. Carroll *may* take a trip to Germany, Mr. Casey capitalized on the opportunity to reference Mr. Carroll's "hectic travel schedule" and suggested bringing in a new review committee to handle certain Trusted Fan responsibilities. Mr. Carroll reminded Mr. Casey again that, he may or may not be traveling but would be available to work.

46.     That same day, Mr. Casey, unprovoked, questioned whether Mr. Carroll would be attending a call, or whether he would have another employee "covering for" him the next day. Though confused by the presumption, Mr. Carroll confirmed that he would be joining the call.

47.     Mr. Carroll indeed worked the entire time that he was in Germany while receiving treatment. During that time, he not only arranged for meetings with representatives from some of the largest sporting and entertainment venues to discuss Trusted Fan, but also secured state and federal contracts.

48.     Despite these victories, Mr. Casey focused their communications on Mr. Carroll's health. Mr. Casey continued to raise questions regarding whether Mr. Carroll would (or could) continue to work during treatments and propose that others could take over for Mr. Carroll during meetings and calls if Mr. Carroll was not "up to" attending them.

49.     Yet again, at no time did Mr. Carroll indicate that he was not "up to" participating in his scheduled meetings. To the contrary, Mr. Carroll had been regularly updating Mr. Casey about his ongoing meetings and developments in both the Trusted Fan and Enrollment Services businesses throughout his trip.

50.     On July 1, 2019—the night before Mr. Carroll's scheduled return from his trip to Germany—Mr. Casey sent a text message questioning Mr. Carroll's negotiation of a Trusted Fan deal with the owners of the New York Giants and New York Jets. In the same message, Mr. Casey also feigned concern that the Pre-Check enrollment numbers were "cooling off." Mr. Carroll promptly responded, explaining that MetLife stadium (where both the Jets and Giants play) hosts more events than any other NFL stadium in the country, yet received no response.

51.     Mr. Carroll then followed up the next day to ask about a conference call that Mr. Casey had missed that morning, and to report the good news that, far from "cooling off," Pre-Check enrollments were in fact *up* 8.4%. Mr. Casey dismissed the positive Pre-Check numbers and instead commented that Mr. Carroll "must be exhausted" from his trip.

52.     Despite his objective success, that same month, Mr. Casey and Yann Delabrière, IDEMIA's Group CEO and Board Chairman, asked Mr. Carroll to step down as the head of Enrollment Services—the business unit overseeing TSA Pre-Check—and instead lead the newly created "Citizen Services" unit. In this new Citizens Services role, Mr. Carroll would focus exclusively on Trusted Fan and oversee a vastly smaller team.

III.     **IDEMIA Induced Mr. Carroll to Enter a New Employment Contract Through Misrepresentations in Order to Force Him out of the Company.**

53. In 2019, IDEMIA again won the federal contract bid for the Universal Enrollment Services contract (referred to as "UES2"), which included responsibility for TSA PreCheck and 5 other federal programs.

54. Mr. Carroll's role within IDEMIA was vital in securing this contract given his reputation and longstanding relationship with DHS and TSA, years of exemplary oversight of the program, and consistently impressive enrollment numbers.

55. In February 2019, IDEMIA learned that one of its competitors had filed a bid protest appealing the contract award. Securing this contract was critical to IDEMIA's financial security and long-term posturing to take the Company public. Recognizing how crucial Mr. Carroll would be in successfully defending against the appeal, IDEMIA agreed to pay him a large bonus if the Company successfully defended the appeal and secured the UES2 contract.

56. IDEMIA suddenly changed positions once it asked Mr. Carroll to step down as head of the Enrollment Services unit and move to the new "Citizen Services" unit. Instead, the Company used this bonus as leverage to try and force Mr. Carroll to enter into an employment contract with restrictive covenants—something Mr. Carroll had never done previously.

57. Mr. Carroll was initially skeptical. He raised concerns about being bound by the proposed restrictive covenants, and doubts about the ability to run Trusted Fan within the bureaucracy and red tape of a large global corporation. Given that Trusted Fan was a fledgling program in an emerging economic sector, agility and autonomy in developing the program and promptly closing deals with prospective clients were essential to the program's success.

58. Realizing that Mr. Carroll was essential to IDEMIA winning the UES2 contract, and that he was not presently bound by any non-competition agreement, Mr. Casey and other executives within the company implored Mr. Carroll to stay. To quell Mr. Carroll's concerns, and secure his signature on the restrictive covenants that would prevent Mr. Carroll from competing if he left

IDEMIA, Mr. Casey made a series of misrepresentations about the benefits of his new position.

59.     First, Mr. Casey falsely assured Mr. Carroll that IDEMIA's complicated bureaucracy would not be an obstacle to Trusted Fan's success. He declared that he would *personally* approve every deal for Trusted Fan to ensure red tape did not delay the process.

60.     Second, Mr. Casey promised that he would ensure an expedited approval cycle, would guarantee adequate funding, and would grant Mr. Carroll the same autonomy to develop and run Trusted Fan in his new role as he previously had as the head of Enrollment Services.

61.     Next, IDEMIA built in financial incentives to induce Mr. Carroll to execute the new employment contract.  The Company breached its prior promise and made payment of the previously agreed upon bonus for the UES2 contract conditioned on Mr. Carroll's signature. IDEMIA then increased Mr. Carroll's annual base salary by nearly 30% and provided for an over one-million dollars in collective performance-based incentive compensation through 2021. The Company also promised Mr. Carroll equity in IDEMIA that Company executives represented was expected to increase by a magnitude of ten-times the initial equity grant.

62.     Finally, to make sure there was no way for Mr. Carroll to decline the position, Mr. Casey made coercive and threatening overtures to try and force Mr. Carroll to sign the contract with limited review time. Just a few hours after sending over a revised copy of the restrictive employment agreement, Mr. Casey sent a message warning Mr. Carroll that he must "either sign, resign, or [Mr. Casey would] take the necessary action."  Mr. Casey went on to emphasize that if Mr. Carroll accepted, then "we are good." But anything else, "and this story is over." Mr. Casey demanded that Mr. Carroll "take action" or else Mr. Casey would.

63.     Mr. Carroll responded that he had no idea what Mr. Casey was talking about, that he had not received the contract until long after IDEMIA's tentative "deadline" for signing it, and that they had a pre-arranged call scheduled for the next day to discuss. Mr. Casey had no response.

64. Relying on Mr. Casey's reaffirmed commitments that he would ensure the autonomy and funding necessary to run Trusted Fan, and the Company's representations of lucrative financial incentive payments through 2021, Mr. Carroll signed the new employment contract on July 25, 2019.

65. Unfortunately, after Mr. Carroll signed the contract and the Company secured the UES2 contract, he discovered that IDEMIA and Mr. Casey had no intention of upholding their representations or the terms of the new contract.

## IV. Mr. Casey Purposefully Frustrated Mr. Carroll's Ability to Perform His Job

66. Contrary to Mr. Casey's many promises of necessary funding and expedited approval required to make Trusted Fan a success, Mr. Casey soon became an active obstacle to Mr. Carroll's ability to perform his job at all. He was the single largest barrier to getting the newly minted division off the ground.

67. Beginning the week after Mr. Carroll signed the new employment contract was executed and continuing through Mr. Carroll's termination on November 7, 2019, Mr. Casey refused to approve *a single* project or request for funding from Mr. Carroll's division. Because Mr. Casey withheld these necessary approvals, deals that Mr. Carroll had negotiated with the Pittsburgh Steelers, Dallas Cowboys, and Jacksonville Jaguars all fell through.

68. Further impeding Trusted Fan's progress, Mr. Casey insisted that all development of Trusted Fan's mobile application must go through IDEMIA's global corporate Digital Labs, whose team was consistently unable to deliver a finished product. Mr. Carroll knew that the Digital Labs team could not move quickly enough to develop a functioning mobile app necessary to get Trust Fan off the ground and explained this Mr. Casey multiple times. Mr. Casey agreed. In fact, he noted similar concerns multiple times to Mr. Carroll. Just a couple of months before terminating Mr. Carroll, Mr. Casey even wrote that he was going to need to "crawl all over" the head of Digital Labs

in order to speed things up.

69.     Over Mr. Carroll's ardent objections, and despite Mr. Casey's own acknowledgment of Digital Labs' lack of progress, Mr. Casey refused to remove responsibility for Trusted Fan's mobile app from Digital Labs, thereby freezing the program's progress.

70.     Mr. Casey continued his stonewalling despite Mr. Carroll making detailed presentations to him concerning exactly why each request was necessary, with full accounting justifications included. Had Mr. Casey upheld his promises these presentations should not have been required. Pursuant to Mr. Casey's representations, Mr. Carroll was supposed to be in an "autonomous" position. This bloated corporate presentation procedure was the very antithesis to the nimble process free from bureaucratic red tape that Mr. Casey had promised.

71.     In addition to stonewalling all potential progress on Trusted Fan, Mr. Casey also began excluding Mr. Carroll from important meetings and communications with other executive staff right after Mr. Carroll signed the new contract. This effectively isolated Mr. Carroll from the rest of the Company.

72.     Rather than cooperate with Mr. Carroll to ensure Trusted Fan's success, Mr. Casey worked against Mr. Carroll to ensure its failure and provide a pretext to force Mr. Carroll out of IDEMIA.

**V.      IDEMIA Retaliated Against Mr. Carroll After He Raised Concerns About IDEMIA's Government Contract Violations**

73.     As a government contractor, IDEMIA is contractually obligated to achieve certain operating standards.  Mr. Carroll was well aware of these standards and brought attention to shortcomings where they existed. He also proposed workable solutions to address them.

74.     Mr. Casey, however, directed a calculated refusal to comply with the terms of these contracts, including those imposed by the lucrative UES2 relationship with the federal government.

75.     Pursuant to Service Level Agreements ("SLAs") included in IDEMIA's contracts

14

with federal and state agencies, IDEMIA was mandated to keep a specific number of enrollment centers open and operational for a requisite number of business hours. Achieving these targets required adequate staffing of these enrollment centers with a minimum number of employees.

76. Notwithstanding these requirements, IDEMIA regularly failed to keep the requisite number of enrollment centers open and operational, and failed to meet adequate levels of staffing at those centers which remained open. These violations were serious enough to garner warnings of a pending contracts letter from the TSA—an action that could seriously hinder or prevent IDEMIA from securing future contracts with the federal government.

77. Mr. Carroll reported these violations and made concerted efforts to bring IDEMIA into compliance with the contractually obligated service levels. Mr. Carroll identified employee turnover as the biggest contributing factor to IDEMIA's failure to meet its SLAs. In short, he made note of the fact that employees could get more lucrative employment with far less training at other companies.

78. In the fall of 2019, Mr. Carroll devised and pitched a solution to increase enrollment center staff compensation in order to reduce employee turnover, without significantly affecting net revenue. Despite critical shortages in staffing that threatened to shut-down multiple Enrollment Services centers, Mr. Casey refused to take steps to ensure that the Enrollment Services centers were fully staffed and operational.

79. Instead, he dismissed Mr. Carroll's concerns and instructed that he would rather save $5 million for the Company than comply with the obligations set out in the government contracts. Mr. Casey declared that the choice between bringing IDEMIA into compliance or saving $5 million by keeping enrollment centers understaffed was a "no brainer" and refused to take action.

80. Without increased wages, enrollment centers continued to be chronically understaffed, and many were forced to shutter completely due to an inability to hire. Mr. Carroll

continued to voice his concerns up until his termination, while Mr. Casey maintained the Company's deliberate noncompliance.

81.     Mr. Casey also ignored Mr. Carroll's concerns about violating IDEMIA's agreement with the federal Committee on Foreign Investment in the United States ("CFIUS").

82.     CFIUS regulates transactions involving foreign investments in the United States and can condition operation of a United States corporation by a foreign parent on the foreign company's agreement to certain restrictions deemed to be necessary for national security.  This includes protections for the exchange and maintenance of Personally Identifying Information ("PII") of U.S. citizens. IDEMIA's agreement with CFIUS required that all software development and maintenance of programs that could collect PII of U.S. citizens be done domestically—regardless of whether the work was performed pursuant to a government contract.

83.     Mr. Carroll's Enrollment Services unit often operated in a walled-off fashion, keeping its technology development and use separate from the international arm of IDEMIA in order to comply with U.S. regulations on handling the PII of U.S. Citizens.  Due to Trusted Fan's reliance on biometric data, Mr. Carroll expected this practice to continue for his new "Citizen Services" unit.

84.     Mr. Casey's insistence on using IDEMIA's Digital Labs division to develop the Trusted Fan mobile app not only brought Trusted Fan's development to a halt, it also resulted in at least partially outsourcing development of the application to foreign countries. Mr. Carroll raised concerns that this put IDEMIA in violation of the terms of the Company's agreements with CFIUS, and urged Mr. Casey to allow him to bring the development in-house. Mr. Casey refused.

85.     Upon hearing that the Digital Labs division was outsourcing development of Trusted Fan's mobile application to developers in Eastern Europe and South Asia, Mr. Carroll again noted that the CFIUS Mitigation Agreement prohibited foreign development of software that would be used to collect and handle PII of U.S. citizens—one of the central functions of the proposed Trusted

16

Fan application. However, Mr. Casey took no steps to remove Digital Labs' oversight of the application development and move it into the hands of Mr. Carroll's U.S. based team. Shortly after Mr. Carroll first reported these concerns, the Company forced Mr. Carroll into his role as head of "Citizen Services."

86.     IDEMIA's potential and knowing violation of its agreement with CFIUS amounted to a false claim.

87.     Mr. Carroll continued to voice his concerns in his new role, as Mr. Casey continued to refuse to move development into the hands of Mr. Carroll and his team. Shortly after, Mr. Carroll was sidelined and ultimately terminated.

## VI.     IDEMIA Discriminated Against Mr. Carroll by Terminating His Employment

88.     On November 7, 2019, following a board meeting in Washington, D.C., Mr. Casey called Mr. Carroll and told him that "they" did not want him running the Trusted Fan program. The only reason given was that the Company had decided to "go in a separate direction."

89.     When Mr. Carroll asked Mr. Casey if he was being fired, Mr. Casey refused to answer. Instead, he repeated that the Company wanted to "go in a separate direction" and that the Company and Mr. Carroll were separating.

90.     Mr. Carroll's "separation from IDEMIA" was effective as of November 21, 2019.

91.     In the wake of IDEMIA's termination of Mr. Carroll, Mr. Carroll was given a separation agreement that provided for only a portion of the severance pay agreed upon in his contract. The Company also withheld significant bonus compensation it contractually owed to Mr. Carroll. Finally, the Company once again withheld the promised bonus that Mr. Carroll earned for securing the TSA contract. After breaching the agreement and conditioning payment on Mr. Carroll's execution of the new agreement, upon his termination, IDEMIA claimed it would not pay unless Mr. Carroll signed the separation agreement.

92.     When Mr. Carroll pushed back, IDEMIA acknowledged that it was not upholding the terms of the contract, and claimed this was due to undefined "issues of performance and misconduct." The Company provided no further explanation.

93.     Only after Mr. Carroll notified IDEMIA of his intentions to pursue legal action, did IDEMIA provide any further explanation of Mr. Carroll's alleged performance issues and misconduct.

**VII.     IDEMIA Embarked on a Course of Shifting, Post Hoc, Pretextual Explanations Following Mr. Carroll's Termination**

94.     After Mr. Carroll pursued his legal claims against the Company, IDEMIA configured a myriad of shifting justifications for Mr. Carroll's termination, all of which are demonstrably false.

95.     First, IDEMIA claimed that Mr. Carroll had "performance issues." This holds no weight.

96.     In January 2019, Mr. Carroll received a positive performance evaluation.

97.     In February 2019, IDEMIA presented Mr. Carroll with the Employee of the Year award and gave his business unit the Business Unit of the Year award.

98.     In March 2019, the CEO of IDEMIA's global corporation (under which IDEMIA North America is organized) visited Mr. Carroll's branch and praised both Mr. Carroll and his business unit.

99.     In April 2019, Mr. Casey offered Mr. Carroll what IDEMIA branded as a "promotion," complete with a higher salary and additional benefits as part of a new position that he had created specifically for Mr. Carroll.

100.    None of these actions align with IDEMIA's proffered notion that there were allegedly grave concerns with Mr. Carroll's performance.

101.    Next, IDEMIA claimed Fan that Mr. Casey purportedly discovered "issues" with Trusted in September 2019—its progress was allegedly moving "too slowly."

102.    The timing alone of this alleged "discovery" highly suspect.  Mr. Carroll signed his new contract transitioning to exclusive oversight of the Trusted Fan program on July 25, 2019.  Less than two months later, Mr. Casey allegedly discovered that the new Trusted Fan program was moving "too slowly."  This is an unbelievable time frame on which to base any evaluation of performance, let alone performance for the development and launch of a complex, brand new business.

103.    Further, any delay within the Trusted Fan program arises directly out of Mr. Casey refusing to approve *a single* proposal from Mr. Carroll's unit and insisting that Mr. Carroll cede control for the Trusted Fan app to the Digital Labs Division—over Mr. Carroll's ardent objection.

104.    Regardless, there is no basis for Mr. Casey's claim that progress was moving "too slowly." In the three months in which Mr. Carroll performed as the head of Citizens Services, he secured commitments from several major sports teams across the country. He also secured an agreement from a major sports team to pay for Trusted Fan enrollment for all of their box seat ticket holders. He even established proof of concept for the enthusiastic and wide-spread acceptance of the program by fans by manually enrolling thousands of fans on-site at select events.

105.    Nationwide manual enrollment was not realistic, however.  Indeed, the entire premise of Trusted Fan was to avoid lengthy lines by using a mobile app to quickly bypass ticketing, security, and concessions bottlenecks. Having fans wait in long lines at sporting events to even sign up for the program was not only contrary to Trusted Fan's premise; it would be an impossibly expensive endeavor requiring paid employees to attend every single major sporting event or concert around the country to solicit enrollment. Trusted Fan's ability to launch on a nationwide scale was dependent the creation of a functioning mobile app.

106.    IDEMIA next claimed that Mr. Carroll's termination was motivated by an "investigation" that uncovered alleged ethical breaches.  Not satisfied with its baseless accusations

of "performance" issues, IDEMIA next made false allegations of Mr. Carroll's allegedly unethical behavior. None of these claims has any merit, and each are demonstrably false. Further, IDEMIA claimed to have discovered these allegedly unethical breaches during an investigation it conducted only *after* terminating Mr. Carroll.

107.   First, IDEMIA falsely claimed that Mr. Carroll improperly retained an outside consultant without proper authority. But Mr. Carroll never retained the outside consultant to which the Company pointed. While she had previously consulted with IDEMIA in other areas, her only involvement with Trusted Fan was to make introductions between Mr. Carroll and various sporting teams and venues. IDEMIA paid no compensation to this consultant for that alleged "service." Mr. Carroll did not need approval for retaining Ms. Gore as a paid consultant for IDEMIA, because he neither retained her, nor paid her.

108.   Next, IDEMIA claimed that the Company's use of an interior design company run by Mr. Carroll's domestic partner was somehow inappropriate. This is not only untrue, but personally offensive. The interior design company was retained by an entirely different department within IDEMIA, was subjected to oversight by an entirely different department over which Mr. Carroll had no authority, and the invoices were subject to approval through IDEMIA's corporate finance department, over which Mr. Carroll, again, had no oversight or authority. Mr. Carroll did not approve IDEMIA's contract with the interior design company and had no hand in the ultimate decision to hire her.

109.   Further, Mr. Carroll submitted various documents to IDEMIA disclosing his relationship with his partner when the subject of her performing services was initially raised. In fact, he personally raised the issue with the former-CEO to ensure that there was absolutely no conflict of interest with using her services—though it was far removed from Mr. Carroll's role in the Company. All of the necessary approvals and documentation were in place before the Company

retained her services.

110. That IDEMIA alleged to have "discovered" this relationship through its post-termination "investigation" is beyond belief given the documented corporate red tape that Mr. Carroll went through to ensure there was no conflict of interest.

111. Further, the quality of his partner's services speaks for itself. When the former-CEO of IDEMIA's global corporation visited Mr. Carroll, he specifically commented on the interior design of the offices and asked whether the company that designed the offices was able to come to France and also design the corporate offices.

112. Aside from the baselessness of the personal attack, its claim simply makes no sense. IDEMIA implies that Mr. Carroll risked his employment with the company, his lucrative salary, and his entire career, to squeeze out a total of $135,000 *over three years* through his partner. This irrational claim is unworthy of belief.

113. Next, IDEMIA raised allegations concerning Mr. Carroll's allegedly "inappropriate expenses." These are similarly without merit.

114. IDEMIA was unable to identify what, specifically, it was about any alleged expenses that made them "inappropriate." IDEMIA was unable to do so because Mr. Carroll submitted all reimbursement forms through the Company's *independent finance department* that objectively reviewed and approved each of the requests.

115. At no point did anyone from the finance department raise any concerns with any of Mr. Carroll's submitted expenses during its independent review and approval process.

116. Finally, IDEMIA accused Mr. Carroll of alleged "inappropriate relationships" with competitor companies. This allegation fails as well.

117. IDEMIA was unable to identify what companies, alleged relationships, or alleged actions of Mr. Carroll it believed rose to the purported level of "inappropriate."

118.   This is because the more detail IDEMIA might seek to add, the clearer it would become that the Company launched a post-termination investigation to dig up dirt on Mr. Carroll, and instead found nothing.

119.   In short, IDEMIA's adverse actions against Mr. Carroll were directly related and in response to Mr. Carroll's cancer diagnosis, perceptions about Mr. Carroll's ability to perform his job while also having cancer, age, and/or diligence in reporting and attempting to correct IDEMIA's violations of its government contract.

120.   IDEMIA's proffered rationale, though voluminous, amounts to nothing more than a classic cadre of shifting justifications. Left without any reasonable basis for his termination—aside from the actual, discriminatory one—IDEMIA has sought a kitchen sink approach. It has thrown multiple various grounds for termination at the wall in the hopes that one would stick. None of them do. Not a single of the many, at times contradictory, explanations proffered by IDEMIA has any basis in reality. None are worthy of merit, and all are pretextual post hoc attempts to justify an unjustifiable position.

## CAUSES OF ACTION

### COUNT I

### Discrimination in Violation of the ADA/ADAAA, 42 U.S.C. § 12101, *et seq.*

121.   Plaintiff realleges and incorporates by reference the preceding paragraphs as though fully set forth herein.

122.   Defendant discriminated against Mr. Carroll on the basis of his of his disability or regarded him as disabled in violation of the ADAAA.

123.   Defendant regarded Mr. Carroll as having a physical impairment that substantially limited one or more major life activities.

124.   In addition, or in the alternative, Mr. Carroll suffers from an impairment that

substantially limits normal cell growth. Mr. Carroll made a request for reasonable accommodation, including his request to work remotely during the pendency of his treatments.

125.    Defendant routinely allowed employees, including Mr. Carroll, to work remotely for reasons unrelated to medical treatments.

126.    Mr. Carroll was qualified to, could, and did, perform the essential functions of his job for years, as demonstrated through, among other things, his exceptional accomplishments and business generation while employed at IDEMIA. Defendant recognized Mr. Carroll's accomplishments, including through accolades such as Employee of the Year and Business Unit of the Year.

127.    Despite Mr. Carroll's qualifications and exceptional work, Defendant subjected him to adverse employment actions, changing the terms and conditions of his employments, ultimately culminating in his termination and wrongful withholding of his bonus.

128.    Defendant subjected Mr. Carroll to these adverse actions because of his disability or perceived disability.

129.    As a result of Defendants adverse actions, Mr. Carroll has suffered and continues to suffer harm. Mr. Carroll is entitled to recover his damages, including, but not limited to, lost wages and benefits, actual damages, compensatory and punitive damages, reinstatement and/or front pay and benefits, pre-judgment and post-judgment interest, attorney fees and costs, and any such other legal and equitable relief as the Court may deem just and proper.

**COUNT TWO**

**Age Discrimination in Violation of the ADEA, 29 U.S.C. §§ 621, *et seq*.**

130.    Plaintiff realleges and incorporates by reference the preceding paragraphs as though fully set forth herein.

131.    It is unlawful for an employer "to discharge any individual or otherwise discriminate

against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's age." ADEA, 29 U.S.C. § 623(a)(1).

132.    It is also unlawful for an employer "to limit, segregate, or classify his employees in any way which would deprive or tend to deprive any individual of employment opportunities or otherwise adversely affect his status as an employee, because of such individual's age." 29 U.S.C. § 623 (a), (a)(2).

133.    Mr. Carroll is a member of a protected class as an employee older than forty years of age and was an employee of IMEDIA before IDEMIA unlawfully terminated him.

134.    IDEMIA discriminated against Plaintiff with respect to the compensation, terms, conditions, and privileges of his employment. Because of Mr. Carroll's age, Defendant took adverse employment actions against him, including, *inter alia*, forcing him to transfer to a less favorable position, diminishing his scope of authority and responsibility, setting new conditions and requirements for previously earned bonuses, withholding his earned bonuses, and terminating him.

135.    Further, these adverse employment actions were designed to limit, segregate, or classify Plaintiff in such a way that he was deprived of individual employment opportunities and his status as an employee was adversely affected.

136.    IDEMIA's adverse employment actions against Plaintiff were in direct violation of the ADEA, 29 U.S.C. §§ 621, *et seq*.

137.    Age is not a bona fide occupational qualification reasonably necessary to the normal operation of IDEMIA, or Mr. Carroll's roles in IDEMIA.

138.    As a result of of IDEMIA's discrimination, Plaintiff has suffered, and will continue to suffer, harm. Mr. Carroll is entitled to recover his damages, including, but not limited to, lost wages and benefits, liquidated damages, reinstatement and/or front pay and benefits, pre-judgment and post-judgment interest, attorney fees and costs, and any such other legal and equitable relief as

the Court may deem just and proper.

## COUNT THREE

### Retaliation in Violation of the False Claims Act, 31 U.S.C. § 3730(h)

139. Plaintiff realleges and incorporates by reference the preceding paragraphs as though fully set forth herein.

140. At all relevant times, IDEMIA was an employer subject to the provisions of the False Claims Act Retaliation provision, 31 U.S.C. § 3730(h).

141. IDEMIA engaged in activity wherein it accepted payment from the United States government under its government contract, but failed to comply with the terms and obligations set by the government in order to retain a larger portion of the government's payment as profit.

142. While working for IDEMIA, Mr. Carroll engaged in protected activity by investigating, reporting, and opposing IDEMIA's practice of violating the obligations set forth in IDEMIA's contracts with the United States government. Mr. Carroll informed IDEMIA that the activity violated the Company's contractual obligations to the federal government, and put IDEMIA in danger of reprisal from the government, and actively opposed IDMEIA's practice.

143. IDEMIA was aware of Mr. Carroll's protected activity, and discriminated against Mr. Carroll for investigating, reporting, and opposing IDEMIA's unlawful conduct. IDEMIA's retaliatory conduct includes, *inter alia*, forcing him to transfer to a less favorable position, diminishing his scope of authority and responsibility, setting new conditions and requirements for previously earned bonuses, withholding his earned bonuses, and terminating him.

144. IDEMIA's actions were intentional, deliberate, and willful, and taken in callous disregard of Plaintiff's rights.

145. As a result of IDEMIA's retaliation, Mr. Carroll has suffered harm. He is entitled to all legal and equitable remedies available under the law, including lost wages and benefits,

reinstatement, two times the amount of back pay, interest on the back pay, compensation for any special damages sustained as a result of the retaliation, an award of litigation costs and attorney fees, and such other and further legal and equitable relief as the Court may deem just and proper.

**COUNT FOUR**

**Breach of Contract**

146.     Plaintiff realleges and incorporates by reference the preceding paragraphs as though fully set forth herein.

147.     Mr. Carroll's employment agreement with IDEMIA is a legal, valid, and enforceable contract. IDEMIA, as party to the contract, had a duty to conduct itself fairly and responsibly, and not to intentionally or purposely do anything which would have the effect of injuring the right of Mr. Carroll to receive the fruits of the contract.

148.     Mr. Carroll's employment agreement provided for multiple financial incentives to be paid to Mr. Carroll based on preconditions and contingencies set forth in the contract.

149.     IDEMIA intentionally and purposefully frustrated and impeded Mr. Carroll's ability to perform under the contract and receive the agreed upon financial incentives by, *inter alia*, arbitrarily withholding approval for items submitted by Mr. Carroll, impeding the development of the Trusted Fan mobile app, refusing to allow Mr. Carroll to develop the Trusted Fan mobile app within his Business Unit, and  successfully and efficiently rollout the Trusted Fan business, as it failed to ensure that a mobile app was developed within sufficient time for Trusted Fan, failing to attend key meetings with potential clients without explanation, and ultimately terminating Mr. Carroll.

150.     IDEMIA breached its duty of good faith and fair dealing, and as a result, prevented Mr. Carroll from receiving the fruits of the parties' contract.

151.     Further, under the terms of Mr. Carroll's employment agreement, IDEMIA was

26

obligated to pay Mr. Carroll severance pay and the bonuses that he had earned. IDEMIA intentionally refused to pay Mr. Carroll these amounts to which he was owed.

152.    When Mr. Carroll protested, IDEMIA refused to uphold the terms of the contract due to unspecified "issues of performance and misconduct" without further explanation, resulting in a breach of contract.

153.    Mr. Carroll should be awarded damages or remedies for IDEMIA's violations, in the amount that he would have received but for IDEMIA's breach, including, but not limited to, lost wages and benefits, back pay, front pay, and such other and further legal and equitable relief as the Court may deem just and proper.

**<u>PRAYER FOR RELIEF</u>**

WHEREFORE, Plaintiff requests the following relief:

a.    A declaratory judgment that the practices complained of herein are unlawful and violate the laws set forth above;

b.    A reclassification of Mr. Carroll's termination, as his termination, as presently considered "for cause," has negatively affected his reputation and job prospects;

c.    Nominal damages;

d.    Back pay, front pay, lost benefits, actual damages, liquidated damages, unliquidated damages, punitive damages, and other damages for lost compensation and job benefits suffered by Plaintiff in accordance with proof presented at trial;

e.    Compensatory damages in an amount in accordance with proof presented at trial;

f. An award of litigation costs and expenses, including attorney fees to the Plaintiff;

g. Pre-judgment and post-judgment interest; and

h. Such other and further legal and equitable relief as the Court may deem just and proper.

## JURY TRIAL DEMAND

Pursuant to Rule 38(b) of the Federal Rules of Civil Procedure, Plaintiff demands a trial by jury on all triable questions of fact raised in this Complaint.

Dated: October 19, 2021

*/s Heather Moore Collins*
Heather Moore Collins BPR # 026099
Caroline Drinnon BPR# 037016
**Collins & Hunter PLLC**
7000 Executive Center Dr., Suite 320
Brentwood, TN 37027
615-724-1996
615-691-7019 FAX
heather@collinshunter.com
caroline@collinshunter.com

*s/ Leigh Ann St. Charles*
Kevin H. Sharp
Leigh Anne St. Charles
**SANFORD HEISLER SHARP, LLP**
611 Commerce Street, Suite 3100
Nashville, Tennessee 37203
Telephone: (615) 434-7000
Facsimile: (615) 434-7020
ksharp@sanfordheisler.com
lstcharles@sanfordheisler.com

***Attorneys for Plaintiff Charles Carroll***

28