# UNITED STATES DISTRICT COURT
## MIDDLE DISTRICT OF TENNESSEE
### NASHVILLE DIVISION

| | | |
|---|---|---|
| **CHARLES CARROLL,** | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | |
| **v.** | ) | **Case No. 3:21-cv-00800** |
| | ) | **Judge Aleta A. Trauger** |
| | ) | |
| **IDEMIA IDENTITY AND SECURITY** | ) | |
| **USA LLC,** | ) | |
| | ) | |
| **Defendant.** | ) | |

## MEMORANDUM

IDEMIA Identity and Security USA LLC ("IDEMIA") has filed a Motion for Summary Judgment (Doc. No. 56), to which Charles Carroll has filed a Response (Doc. No. 76), and IDEMIA has filed a Reply (Doc. No. 91). IDEMIA has also filed a Motion for Hearing (Doc. No. 61) in connection with that motion. Carroll has filed a Motion in Limine (Doc. No. 81). For the reasons set out herein, the Motion for Summary Judgment will be granted, and the other motions will be denied as moot.

## I. BACKGROUND[1]

### A. Carroll, IDEMIA, and the UES Contract

IDEMIA is the U.S. subsidiary of a France-based "biometric identification and security" company, which is itself owned by an American private equity firm, Advent International. (Doc.

---

[1] The facts set forth herein are from IDEMIA's Statement of Undisputed Material Facts (Doc. No. 58), Carroll's Response to IDEMIA's Statement of Undisputed Material Facts (Doc. No. 77), Carroll's Additional Statement of Material Facts (Doc. No. 77 at 82–98), IDEMIA's Response to Carroll's Additional Statement of Material Facts (Doc. No. 90), and the evidentiary materials cited and relied upon by the parties. If no citation is supplied for a statement of fact set forth herein, it is undisputed, at least for purposes of summary judgment.

No. 77 ¶¶ 1–3.) Prior to January 2018, IDEMIA's CEO was Bob Eckel, who was then succeeded by Ed Casey. (*Id.* ¶ 77.) The parties agree that "Casey made clear upon his arrival as CEO that he intended to replace the management team at IDEMIA and bring his own management team." (*Id.* ¶ 83.) By the end of Casey's tenure as CEO in February 2021, he had mostly made good on that intention, having "replaced the leader of every business unit on the [IDEMIA Executive Committee] and all but one of the leaders of administrative functions (such as legal, human resources, and finance)." (*Id.* ¶ 84.) Carroll—the founder of another biometric security company, which, through a "series of corporate transactions," became a part of IDEMIA—is one of those departed leaders, and this lawsuit is about the events leading up to and surrounding his firing. (Doc. No. 77 ¶ 6.)

For most of the years preceding that firing, Carroll was IDEMIA's Senior Vice President of Enrollment Services, which included a seat on the company's Executive Committee. (Doc. No. 77 ¶ 7.) As the leader of Enrollment Services, Carroll oversaw the Universal Enrollment Services ("UES") contract between IDEMIA and the federal government, pursuant to which IDEMIA managed enrollment in the Transportation Security Administration's ("TSA") "PreCheck" program. (*Id.* ¶ 8.) TSA PreCheck "offers [air] passenger members expedited screening in designated lanes if they have been cleared for such screening based on certain background checks conducted prior to their arrival at the airport." *Ruskai v. Pistole*, 775 F.3d 61, 64 (1st Cir. 2014) (quotation omitted).

As the recipient of the UES contract, IDEMIA was "exclusively responsible for operating Enrollment Centers (located in airports and other locations) where members of the traveling public [could] apply to enroll in PreCheck and get fingerprinted as part of the necessary background check before an individual is approved for eligibility." (Doc. No. 77 ¶ 13.) The

2

contract was structured in such a way that made it unnecessary for IDEMIA to seek or receive payment from the TSA itself in connection with the processing of an individual's application. Rather, the applicant would pay a fee directly to IDEMIA, and IDEMIA would transmit an agreed-upon amount per applicant to the TSA, retaining the rest for itself. (*Id.* ¶¶ 19–20.)

One of Carroll's duties as the head of Enrollment Services was to ensure that IDEMIA's enrollment operations met certain required "customer service levels" set out in the TSA's Service Level Agreements, or "SLAs." In particular, IDEMIA was required to keep a baseline number of enrollment centers operational for a minimum number of hours per day and to maintain certain minimum staffing levels for call centers. (*Id.* ¶¶ 23–24.) The parties agree that IDEMIA "periodically faced challenges" in meeting those requirements. (*Id.* ¶ 25.) The parties also agree, however, that the TSA was aware of IDEMIA's struggles and that IDEMIA "never misrepresented its compliance with the SLAs to obtain payment from TSA." (*Id.* ¶¶ 26–27.)

The parties disagree, however, regarding the nature and the gravity of the problem. Carroll has testified, in connection with this case, that he believes that IDEMIA was "intentionally not meeting the requirements of the contract" because staffing the enrollment and call centers adequately would have been more expensive than IDEMIA's leadership would tolerate. (Doc. No. 56-2 at 206.) As a result, according to Carroll, the company was "being paid for services that [it wasn't] delivering." (*Id.* at 207.) He conceded, however, that, because IDEMIA was compensated in the form of retained portions of enrollment fees, the SLA shortfalls did not result in IDEMIA's ever having been paid a particular amount for a service that was not performed—such as would have been the case if, for example, IDEMIA had been paid a fee, from the TSA's own budget, for keeping an enrollment center open when, in fact, that center had been closed. (*Id.* at 208–09.)

3

IDEMIA points out that its staffing challenges did not prevent it from receiving positive performance assessments from the TSA in 2018 and 2019, and it asserts that, whatever Carroll says now, he "never reported" the alleged wrongdoing "to TSA or otherwise." (Doc. No. 77 ¶¶ 30–31.) Carroll disputes that characterization, but he does not cite any evidence suggesting that he reported the company's noncompliance to the TSA or any outside authority, such as the Department of Justice or the Department of Homeland Security's Office of Inspector General. Rather, he cites his own general testimony that he "kept bringing [the issue] up and kept pushing it" internally. (Doc. No. 78-1 at 214.) Carroll also says that he complained internally that certain of IDEMIA's practices or proposed practices placed it at risk of violating a Mitigation Agreement that the company was required to sign, due to its status as a federal contractor with a non-U.S. parent company. (Doc. No. 77 ¶¶ 34–53.)

**B. Carroll's Health and Medical Treatment**

During the events that ultimately form the basis of this case, Carroll was in his mid-60s. (*See* Doc. No. 56-2 at 269.) Earlier, in 2014, Carroll was diagnosed with prostate cancer, for which he continued to receive treatment for the remainder of his time at IDEMIA. (Doc. No. 77 ¶ 55.) The parties agree that "Carroll's cancer diagnosis never impacted his ability to perform his job at IDEMIA," although Carroll states that that was only true because he was permitted to work remotely "through treatments." (*Id.* ¶ 58.) IDEMIA states that Carroll never requested any kind of accommodation in connection with his illness, and, while Carroll disputes that as a mischaracterization, Carroll does not identify any such request. Instead, Carroll points to testimony establishing that he sometimes traveled for treatment. The implication appears to be that, if Carroll had not been permitted to work remotely, then he would have required an accommodation to that effect, in order to permit him to continue working during treatment-

related travel. (*Id.* ¶ 59; *see* Doc. No. 78-1 at 118–20.) Carroll informed Casey of his diagnosis in early 2018. (Doc. No. 77 ¶ 78.) Casey expressed support and encouraged Carroll "to take the time he needed and to take care of his health." (*Id.* ¶ 82.)

In early June 2019, Carroll informed Casey that he planned to travel to Germany for experimental treatment. (*Id.* ¶ 150.) Carroll was in Germany for the latter half of June 2019 and the entirety of July 2019, but he continued working throughout that period. (*Id.* ¶¶ 152–53.) Carroll and Casey remained in communication and, at times, discussed the treatments themselves, in addition to IDEMIA's business. The parties agree that these conversations about Carroll's health were, "on a number of occasions," initiated by Carroll. (*Id.* ¶ 156.) At one point, Casey offered to come to Germany himself in order to travel home with Carroll, which Carroll says that he found "bizarre." (*Id.* ¶ 159.)

During Carroll's deposition, he testified that, based on his own interpretation of his communications with Casey, he did not believe that Casey actually expected him to be able to perform his work adequately during the treatment. (Doc. No. 78-1 at 275–76.) He stated that he "never received any, really, sympathetic support from" Casey. (*Id.* at 276.) Carroll now concedes, however, that Casey's text messages to him included many express statements of ostensible support, which the evidence reflects. Carroll argues that those statements of support were simply a ruse to facilitate Casey's "constant probing" regarding Carroll's health, with which Casey had, Carroll argues, become obsessed. (Doc. No. 77 ¶ 160.) Among other things, Carroll points to a July 11, 2019 email in which Casey wrote, "I know you are not feeling 100% so be smart about conserving your energy and building your strength." (Doc. No. 80-9 at 1140.)

Carroll states that Casey warned him, at times, that Casey did not want to deal with any "surprises" regarding Carroll's health. (Doc. No. 78-1 at 55.) Casey testified that he did not

remember saying that, but that he would not be surprised to learn that he had done so, because Casey had, in fact, wanted Carroll to keep IDEMIA informed of any work-related issues that might arise in connection with Carroll's health. (Doc. No. 78-4 at 177.) IDEMIA has conceded, for the purposes of summary judgment, that "Casey was focused on how he looked in the eyes of management and did not want Carroll's cancer or treatments to reflect upon any work output that Casey was responsible for." (Doc. No. 90 ¶ 41.)

## C. The Trusted Fan Program

IDEMIA faced a challenge that large, specialized government contractors sometimes do: the relative lack of a developed market for many of its services in the private sector. (Doc. No. 77 ¶¶ 68–70.) In 2017, Carroll conceived of a product that might rectify that problem with regard to the company's substantial expertise developed in connection with TSA PreCheck: the "Trusted Fan" program, which would provide PreCheck-like "fast pass" services for entertainment facilities, such as sports stadiums, arenas, and concert venues. (*Id.* ¶¶ 60–62.) Based on the potential that IDEMIA initially saw in Trusted Fan, the company designated the product as a key business in its growth-focused Value Creation Plan ("VCP"). (*Id.* ¶¶ 71–72.) The parties agree that, "[o]f all the growth initiatives included in the VCP, Trusted Fan was considered one of the most promising new business opportunities . . . [,] because it aligned with IDEMIA's strategy of diversifying its sources of revenue from a primarily government customer business to one that included a non-government consumer business." (*Id.* ¶ 75.)

As originally conceived, the Trusted Fan program would use a technology that IDEMIA was developing that enabled an individual to "wave their hand at a sensor for entry to an event, to buy merchandise, or to pay for food and beverages." (*Id.* ¶ 63.) IDEMIA, however, struggled to make that technology a practical, feasible reality. In the right conditions, it apparently worked.

In other conditions, however—particularly, in sunlight—it allegedly became unreliable. (*Id.* ¶ 65; Doc. No. 56-1 ¶ 11.)

IDEMIA claims that, in addition to the technological challenges associated with the "wave" approach, Trusted Fan suffered from a more general lack of a "a cohesive and viable business model," particularly with regard to client adoption and generation of revenue. (Doc. No. 77 ¶ 67.) Carroll disagrees and attributes Trusted Fan's struggles to the fact that IDEMIA "understaffed and underfunded the program" and forced Carroll to rely on IDEMIA's "Digital Labs" division for development, despite that division's "poor reputation" and inability to deliver on its responsibilities. (*Id.* ¶¶ 53 n.1, 76.) Carroll also complains, repeatedly, that the discrepancy between the expectations facing the Trusted Fan program and the program's reality were due to the fact that IDEMIA itself—not Carroll acting unilaterally—"drastically changed its revenue expectations" for the program in 2019, in order to bolster the "potential to take the company public." (*E.g., id.* ¶ 104.) IDEMIA ultimately concedes, for the purposes of summary judgment, that Carroll's initial projections were more modest and were revised upward by the company. (Doc. No. 90 ¶ 16.)

IDEMIA has presented evidence suggesting that Casey had concerns about Trusted Fan fairly early in the development process. (*Id.* ¶¶ 87–88.) For example, in an email exchange between Carroll and Casey in March and April 2018, Casey voiced concerns about a number of aspects of Trusted Fan, including its overly optimistic enrollment projections and the fact that "the numbers" did not "work." (Doc. No. 56-7 at 1009.) Other IDEMIA executives testified or declared under penalty of perjury that Casey openly voiced his skepticism. (*See* Doc. No. 56-1 ¶¶ 16–29; Doc. No. 78-2 at 55–56.) Carroll denies that Casey experienced early concerns, but he does not meaningfully refute IDEMIA's evidence of those concerns. Instead, Carroll mostly uses

his responses to these asserted facts to highlight his grievances that IDEMIA, among other things, "undermined his ability to meet benchmarks by insisting on using Digital Labs." (Doc. No. 77 ¶ 87.) Contemporaneous communications between Carroll and Casey confirm that Casey was aware of concerns about Digital Labs, and IDEMIA has conceded, for the purposes of summary judgment, that "Digital Labs was moving slowing with production of Trusted Fan technology." (Doc. No. 90 ¶¶ 34, 36.)

Another alleged weakness of Trusted Fan was that, pursuant to Carroll's plan for the product, IDEMIA would have to pay venues and sports teams millions of dollars in marketing fees in order to gain access to potential enrollees at events—costs that, IDEMIA suggests, would not have been adequately defrayed by the actual enrollment levels accomplished. Carroll does not dispute that he called for such expenditures, but he protests that "[t]he marketing deal was to get [the company's] foot in the door," after which Trusted Fan would "transition to a revenue share model." (Doc. No. 77 ¶ 89.) In 2018, IDEMIA spent approximately $2.7 million on Trusted Fan-related marketing agreements, despite the fact that the hoped-for technology at the center of the program was not yet viable. (*Id.* ¶ 94.)

Carroll also complains about IDEMIA's alleged failure to staff Trusted Fan properly. He says that he warned IDEMIA that Trusted Fan would not succeed if he did not receive more support. IDEMIA concedes, for the purposes of summary judgment, that Carroll made those complaints. (Doc. No. 90 ¶ 15; *see also* Doc. No. 78-11; Doc. No. 80-32.) IDEMIA also concedes that the financial assumptions underlying Trusted Fan's projected success depended on the technology itself being viable. (Doc. No. 90 ¶ 19.) In support of his assertions that Trusted Fan could have succeeded, Carroll points to testimony by IDEMIA Chief Security Officer

8

Dennis Kallelis, who said that he usually found Carroll's market plans to be of acceptable quality based on the relevant "numbers." (Doc. No. 80-2 at 48.)

### D. UES2 and Carroll's Reassignment

In 2018, the TSA informed IDEMIA that there would be a competitive bidding process for the UES contract's successor contract, known as "UES2." Accordingly, IDEMIA would have to demonstrate its superiority to other potential vendors in order to retain its arrangement with the TSA. (Doc. No. 77 ¶¶ 14–15.) Casey testified that he was concerned about the Enrollment Services division's preparation for the process:

> In conversations with Charlie [Carroll] and his key deputies, I was asking whether or not they had a plan, what did that work plan look like, what were the milestones, what was the win strategy, how were we going to prevail, who are we—who do we think we're going to compete against.· And in February of '18, again, it was in the second month on the job, but this was a priority because it was a large contract.· I didn't get satisfactory answers to any of those questions and became deeply concerned.

(Doc. No. 56-4 at 17.) Casey's concerns, he says, led him to travel to IDEMIA's Tennessee-based Enrollment Services offices, accompanied by the company's COO and two outside consultants, "to go out and to ensure that the . . . right work was being done and that the work product was going to be satisfactory." (*Id.* at 17–18.) IDEMIA concedes for the purposes of summary judgment that, during this trip, Casey asked Carroll, while the two were attending a dinner, why Carroll would "still want to do the heavy lifting" at his age. (Doc. No. 90 at 15.)

Casey testified that the  consultants discovered deficiencies in the planned proposal that IDEMA was able to rectify before submission. (Doc. No. 56-4 at 18.) Casey, however, did not remove Carroll from the project. Casey testified that he had spoken to one of the company's

9

consultants on the bid regarding whether reassigning Carroll was advisable, and the consultant had warned against making such a change to the relevant leadership while a competitive bid process was underway. (Doc. No. 56-4 at 50.) Ultimately, the bid was successful, and IDEMIA was awarded UES2 in January 2019. (Doc. No. 77 ¶ 108.) Carroll's performance review for 2018 credited him with having "[w]on UES2" and praised both his hard work and his strategic vision. (*See* Doc. No. 80-3 at 6243.) Enrollment Services ultimately won IDEMIA's "Business Unit of the Year" award. (Doc. No. 90 ¶ 7.)

Casey, however, had begun "to formulate a plan to separate Trusted Fan from Enrollment Services"—which, if Carroll followed Trusted Fan, would remove him from his position over the company's prized TSA PreCheck business and leave him only with that much more precarious, developmental project in his portfolio. (Doc. No. 77 ¶¶ 112, 122.) Carroll agrees that Casey developed such a plan, but Carroll disputes that it had anything to do with his performance in the UES2 process. Carroll suggests, based on the timing and his own speculation, that Casey's efforts began in earnest after Carroll informed him, in November 2018 text messages, that he had had to return to the Mayo Clinic and that he had begun a new round of medication that was "hard on [his] body" in a way that, at least at first, interfered with his ability to attend some meetings in person. (*Id.* ¶ 112; *see* Doc. No. 60-2 at 417.) Carroll points, in particular, to a text message from Casey on March 6, 2019, in which Casey suggested that Carroll had "too much on [his] plate" in light of various business matters, including Trusted Fan, as well as his "upcoming trip to Germany and everything related to that." (Doc. No. 80-13 at 496.) Casey has testified that he made those comments in the context of informing Carroll that Carroll would not be leading the response to an additional, non-UES2 TSA request, and Casey stated that Carroll's treatment and

travel played no role in the decision to assign that responsibility to another employee. (Doc. No. 78-4 at 94–95.)

Carroll concedes, moreover, that "Casey believed Trusted Fan needed dedicated leadership to focus on developing and operationalizing a viable business model" and that "Casey . . . determined that PreCheck was too important to the [c]ompany to have a leader that had his attention divided between PreCheck and developing a new business, Trusted Fan." (Doc. No. 77 ¶ 115–16.) Carroll also concedes that there were "ample reasons to consolidate all the government-focused businesses under a single business leader"—which they, until that point, had not been, with the TSA PreCheck business under Carroll in Enrollment Services and other TSA business under a different leader in another division, Public Services. (*Id.* ¶¶ 117–18.)

In April 2019, Casey informed Carroll of his intention to reassign Carroll to the position of Senior Vice President, Corporate Development, in which capacity he "would be responsible for identifying, initiating, . . . and formulating the commercial terms for new commercial contracts, as well as conceiving of and developing new market opportunities." (*Id.* ¶¶ 127–28.) Carroll concedes that "Casey believed that the new role would best leverage Carroll's strengths." (*Id.* ¶ 131.) Carroll would remain a member of the Executive Committee and would receive a "significant increase in compensation." (*Id.* ¶¶ 127, 129.)

Carroll and IDEMIA began discussing the specific terms of his new position. Carroll sought a greater salary increase, which Casey agreed to support in his discussions with IDEMIA's parent company. (*Id.* ¶¶ 127, 135, 137.) Carroll also told Casey that his preference was to continue overseeing both Trusted Fan and Enrollment Services, but Casey rejected the idea. Casey did, however, tell Carroll that he "could choose which business he wanted to retain." (*Id.* ¶ 142.) Carroll elected to keep Trusted Fan, which, Carroll concedes, "Casey supported . . .

11

because Carroll was passionate about Trusted Fan, and Casey wanted to provide Carroll the opportunity to spend 100 percent of his time on the project to determine whether the initiative had merit, especially due to the lofty financial projections Carroll's team was presenting." (*Id.* ¶ 143–44.)

On May 19, 2019, however, Carroll emailed Casey and informed him that he had decided to resign. Rather than accepting the resignation, however, Casey convinced Carroll to remain. (*Id.* ¶¶ 145–46.) Carroll and IDEMIA spent the next two months negotiating the terms of his new position. (*Id.* ¶ 147.) It was during this negotiation period that Carroll traveled to Germany for experimental treatment. (*Id.* ¶ 152.)

Carroll concedes that the negotiations "were tense at times." (*Id.* ¶ 148.) Carroll also concedes that that tension was "largely because" the CEO of IDEMIA's parent company, Yann Delabriere, had grown "frustrat[ed] with Carroll's continued requests for more money and delay in committing to this new, important position with IDEMIA." (*Id.*) Casey, however, continued to advocate for the approval of Carroll's demands. (*Id.* ¶ 149.)

In a July 16, 2019, message, Casey urged Carroll to accept the current offer and wrote, "I think you know I want you to stay and have tried to make it attractive for you to stay . . . . I have been lobbying for you . . . . Make no mistake, we want you as a partner . . . . I want you to stay. I want you as a partner." (*Id.* ¶ 162; Doc. No. 56-2 at 470.) Casey warned Carroll, however, that time was running out to reach an agreement. (Doc. No. 56-2 at 470.) Three days later, Casey expressed frustration that still no deal had been reached, and he said that he was "disappointed" and felt that Carroll had "taken advantage of [his] kindness." (*Id.* at 474.)

Carroll concedes that, "[b]etween July 12 and July 25, 2019, Casey repeatedly texted and emailed Carroll imploring him to sign the Agreement." (Doc. No. 77 ¶ 163.) At the end of that

12

period, Carroll finally did so, accepting a position that was now referred to as Senior Vice President of Citizen Services. (*Id.* ¶ 164.) His new base salary of $450,000 made him the highest paid member of the Executive Committee by a considerable margin. (*Id.* ¶ 165.) IDEMIA calls the new position a "promotion," but Carroll calls it a "demotion to a position with significantly less responsibility." (*Id.* ¶ 9.)

**E. Carroll's Termination**

With the UES2 bid process behind him and his new position finalized, Carroll still faced the task of trying to shepherd Trusted Fan to some level of success. Carroll concedes that, throughout the process, Casey expressed his concerns to Carroll regarding the Trusted Fan business model. Indeed, Carroll concedes that "everyone was concerned about" Trusted Fan, although Carroll places all the blame for that concern at the feet of Digital Labs and IDEMIA's other leadership. (*Id.* ¶ 168.)

Casey testified that he told Carroll that he did not believe that Trusted Fan could actually generate the kind of revenues that the company was projecting. (*Id.* ¶ 171.) Carroll concedes that, "[n]otwithstanding [Casey's] continuing skepticism and concerns with Carroll's progress on developing a viable business plan for Trusted Fan (or whether the business model could ever be viable), Casey continued to provide support for Carroll's development of Trusted Fan." (*Id.* ¶ 173.) Among other things, Casey "attempted to intervene to expedite the development of the technology platforms that Carroll claimed to need." (*Id.* ¶ 176.) Carroll also arranged for Trusted Fan to be supported by a marketing consulting agency, Wunderman Thompson. (*Id.* ¶ 180.)

In the latter half of the summer of 2019, Carroll asked his chief of staff, Senior Vice President Ben Mallen, to travel to Franklin to meet with Carroll and his team regarding Trusted

13

Fan's financial projections.[2] (*Id.* ¶ 186.) An email from to Mallen to Carroll around that time stressed the "urgency" of the company's having the "ability to successfully scale the Trusted Fan Business" and provided a long list of topics that needed to be addressed. (Doc. No. 56-1 at 1010.)

Mallen states that, "[d]uring my meetings with Carroll and his team in Franklin, it quickly became clear that Casey's concerns with the Trusted Fan business model were correct and that Trusted Fan could not possibly meet the revenue and profitability projections" that had been presented as part of the VCP. (Doc. No. 56-1 ¶ 28.) Mallen says that the problems with "Carroll's execution of a plan to operationalize Trusted Fan were many," including, in particular, that, "even though it was a basic assumption of his business model, Carroll had not developed a strategy for how to transition from IDEMIA paying the significant marketing fees to sports teams/venues to those sports teams/venues instead paying IDEMIA for the right to have attendees access Trusted Fan." (*Id.*)

Carroll's model for Trusted Fan, moreover, "required significant labor costs and would not allow for enrollment at the rates needed for Trusted Fan to generate net-positive revenue," and Carroll's "digital strategy was not nearly mature enough to support the kind of earnings" that the company had been touting. (*Id.*) Mallen says that he was "alarmed to learn that Carroll's team had failed to even develop a project plan that would bring the service itself to fruition (something that is not only a standard business practice but expected when attempting to execute on a new business strategy)." (*Id.* ¶ 29.) Carroll does not dispute that he lacked such a plan, but he protests that it was not "even a requirement." (Doc. No. 77 ¶ 193.) In light of all of these

---

[2] Carroll says that he denies Mallen's account, but he, for the most part, fails to refute it with citation to contradictory evidence—citing, instead, simply to a brief portion of his deposition in which he stated that he did not recall Mallen's role, if any, in the events described. (*See* Doc. No. 77 ¶ 186–88 (citing Doc. No. 78-1 at 217–18).)

14

issues, Mallen, he says, came to believe "that Carroll's development of the Trusted Fan business model and execution on a viable business plan was failing." (Doc. No. 56-1 ¶ 29.)

On September 16, 2019, Casey, Mallen, and Senior Vice President of Consumer Services and Corporate Development Ajay Amlani met with Carroll and his team in Franklin. (Doc. No. 77 ¶ 198.) The purpose of the meeting was, in Mallen's words, to "provide Carroll an opportunity to articulate how the Trusted Fan business model would be successful and see if the model could ever become a sustainable, profit-generating business." (Doc. No. 56-1 ¶ 30.) According to Mallen, "Carroll had no viable proof of concept, and due to these failures in organization and strategy, he could not provide any objective basis or even a realistic timeline for his projection that the Trusted Fan concept would generate a profit." (*Id.* ¶ 31.)

Casey's account of the meeting is similarly harsh. He testified that, when he and the other executives pushed Carroll and his team regarding their assumptions, "there was really nothing underneath it." (Doc. No. 78-4 at 129.) Casey was also concerned that there were basic details regarding the underlying market—such as season ticket renewal calendars—that Carroll's team was apparently unfamiliar with. (Id. at 128–30.) He described his ultimate takeaway from the meeting as follows:

> [O]ur conclusion was either this is kind of incompetence and we didn't think Charlie was stupid or he hasn't—he hadn't been forthcoming with us about how much further it had to go and how far we actually were away from the finish line. And the team concluded that there's no way we're going to generate revenue in that short period of time given all that had to be done.

(*Id.* at 130.) Casey, according to his testimony, concluded that the situation was "unacceptable." (*Id.* at 131.)

In Carroll's deposition, he denied that Casey's reaction at the meeting was "less than positive." (Doc. No. 78-1 at 218.) When pressed, however, he conceded that, at that point,

15

"everybody," including Carrol himself, was or should have been concerned about Trusted Fan. Carroll explained, "We made commitments to partners that we were not keeping; we were making promises; competitors were coming on the market . . . ; and we couldn't develop a mobile app." (*Id.* at 219.) The parties' ultimate disagreement, therefore, does not appear to be whether Trusted Fan was in significant trouble—because Carroll has admitted that it was—but the extent of Carroll's culpability for the program's problems, which Carroll largely pins on IDEMIA and Digital Labs.

In the wake of the meeting, Casey requested that a team of executives led by Amlani perform an evaluation of whether Trusted Fan was salvageable. (Doc. No. 77 ¶ 208; *see* Doc. No. 56-1 ¶¶ 34–35.) The team put together a PowerPoint presentation setting forth a "Citizen Services/Trusted Fan Recovery Plan." (Doc. No. 56-1 ¶ 35.) The presentation identified five "[s]ignificant issues . . . with [the] current Trusted Fan execution plan." (Doc. No. 60-7 at 7484.) Among those issues were that Trusted Fan was "[l]acking long-term business vision and strategy" and had "[n]o product/solution roadmap tied to customer value." (*Id.* at 7486.) The presentation went on to state that a "[b]usiness [m]odel [r]eset" was "[r]equired." (*Id.* at 7490.)

During this time, Carroll continued to pursue cancer treatment. On October 21, 2019, Carroll emailed Casey, stating that he was "off sick but working" and mentioning that he was awaiting an appointment at MD Anderson, a cancer center. (Doc. No. 80-11.) Carroll testified that he had some familiarity with MD Anderson as a place to receive treatment for "serious cancer," because he had spoken to experts about it in connection with his wife's health. (Doc. No. 78-4 at 66–68.)

According to Casey, the problems that he and others had discovered with Trusted Fan led him to conclude that Carroll needed to be replaced. (Doc. No. 56-4 at 132.) On November 6,

16

2019, Casey informed Carroll that he was being relieved of his duties and that his employment with the company was ending.[3] (Doc. No. 77 ¶ 211.) Carroll testified that Casey told him the company was "going to go in a different direction." (Doc. No. 78-1 at 242.)

Carroll points out that IDEMIA's employee handbook ordinarily calls for a series of warnings and a performance improvement plan before an employee is terminated for performance reasons. IDEMIA does not dispute that such a policy exists, but it denies that that policy is relevant to the termination of an executive-level employee. (Doc. No. 90 ¶ 5.)

IDEMIA concedes, for the purposes of summary judgment, that neither Casey nor anyone else in IDEMIA's upper management specifically told Carroll that he or she was "unhappy with [Carroll's] work performance or that his performance needed improvement." (*Id.* ¶ 9.) IDEMIA also concedes that executives of IDEMIA and its parent company, at times, praised Carroll's team—such as when Delabriere claimed to have been "amazed and impressed" by the work Enrollment Services had performed. (*Id.* ¶ 8.) IDEMIA further concedes that, according to documentation in the record, Carroll's positive performance review for 2018 rated him more highly than most of the other managers who were rated by Casey. (*Id.* ¶ 11.) Finally, IDEMIA concedes that, as the company prepared for Carroll's exit, there were internal drafts of the announcement of the move that were laudatory of Carroll's contributions and claimed that Carroll was merely leaving to pursue another opportunity. (*Id.* ¶ 65; *see* Doc. No. 80-19.) An early draft in the record also stated that Carroll's team would begin reporting to Amlani, a statement that was eventually removed, along with the explanation for Carroll's departure. (Doc. Nos. 80-19, -20; *see also* 80-24 (email from Casey to the Executive Committee acknowledging that Amlani would "step in and lead Citizen Services/Trusted Fan during the transition").)

---

[3] The Statement of Undisputed Material Facts refers to this date as November 6, 2020, but this appears to be a typo. The cited portion of the record confirms that the relevant date was November 6, 2019.

17

IDEMIA asserts that, after Carroll was told his employment was ending but before the formal termination went into effect, it discovered that "Carroll had failed to disclose significant conflicts of interest" and was responsible for some "expense report irregularities." (Doc. No. 77 ¶¶ 214–15.) According to IDEMIA, a subsequent third-party investigation substantiated the company's concerns. (Doc. No. 77 ¶ 217.) On November 21, 2019, IDEMIA Vice President of Human Resources Karen Gregory informed Carroll that he was terminated, effective immediately, for underperformance and misconduct. (*Id.* ¶ 218.)

IDEMIA says that Carroll was not directly replaced, but Carroll says that, whatever titles were involved, he was replaced by Amlani as the executive responsible for Trusted Fan. (*Id.* ¶ 221.) Ultimately, though, IDEMIA "abandoned the Trusted Fan business model altogether and [wrote off] the approximately $4 million dollars invested by IDEMIA in Trusted Fan between 2018 and 2019." (*Id.* ¶ 220.)

## F. This Lawsuit

On October 19, 2021, Carroll sued IDEMIA in this court. (Doc. No. 1.) He states four counts. Count I is for disability-based discrimination in violation of the Americans with Disabilities Act and Amendments ("ADA"). (*Id.* ¶¶ 121–29.) In support of this claim, the Complaint alleges that IDEMIA "subjected [Carroll] to adverse employment actions, changing the terms and conditions of his employment[], ultimately culminating in his termination and wrongful withholding of his bonus," because Carroll either was, or was perceived to be, disabled in connection with his cancer. (*Id.* ¶¶ 127–28.) Count II is for age-based discrimination in violation of the Age Discrimination in Employment Act ("ADEA"). Carroll's theory of the case with regard to Count II is similar to his theory with regard to Count I, but he substitutes his age, rather than his cancer status, as the reason for his alleged mistreatment. (*Id.* ¶¶ 130–38.) Count

III is for retaliation in violation of the False Claims Act ("FCA'). (*Id.* ¶¶ 139–45.) Carroll states that he was forced out of his original position and ultimately fired because he "engaged in protected activity by investigating, reporting, and opposing IDEMIA's practice of violating the obligations set forth in IDEMIA's contracts with the United States government." (*Id.* ¶ 142.) Count IV is for breach of contract and focuses on Carroll's alleged right to severance and bonuses. (*Id.* ¶¶ 146–53.)

On September 22, 2023, IDEMIA moved for summary judgment. (Doc. No. 56.) It has also moved for a hearing in connection with that motion, which the court will, consistently with its ordinary practice of resolving Rule 56 motions on the filings, deny. (Doc. No. 61.) On October 22, 2023, Carroll filed a Motion in Limine asking the court to "exclude any reference to any alleged investigation or allegations of misconduct or facts surrounding [that topic] conducted after Plaintiff was notified of his termination either at the summary judgment stage or trial." (Doc. No. 81.)

## **II. LEGAL STANDARD**

Rule 56 requires the court to grant a motion for summary judgment if "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). To win summary judgment as to the claim of an adverse party, a moving defendant must show that there is no genuine issue of material fact as to at least one essential element of the plaintiff's claim. Once the moving defendant makes its initial showing, the burden shifts to the plaintiff to provide evidence beyond the pleadings, "set[ting] forth specific facts showing that there is a genuine issue for trial." *Moldowan v. City of Warren*, 578 F.3d 351, 374 (6th Cir. 2009); *see also Celotex Corp. v. Catrett*, 477 U.S. 317, 322–23 (1986). "In evaluating the evidence, the court must draw all inferences in the light most

favorable to the non-moving party." *Moldowan*, 578 F.3d at 374 (citing *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986)).

At this stage, "the judge's function is not . . . to weigh the evidence and determine the truth of the matter, but to determine whether there is a genuine issue for trial." *Id.* (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249 (1986)). But "[t]he mere existence of a scintilla of evidence in support of the [non-moving party's] position will be insufficient," and the party's proof must be more than "merely colorable." *Anderson*, 477 U.S. 242, at 252. An issue of fact is "genuine" only if a reasonable jury could find for the non-moving party. *Moldowan*, 578 F.3d at 374 (citing *Anderson*, 477 U.S. at 252).

## III. ANALYSIS

### A. Framework for Considering Counts I through III

There is no direct evidence that Carroll was terminated based on his cancer diagnosis,[4] his age, or his concerns about IDEMIA's compliance with federal contracts. Therefore, the court utilizes the well-known "*McDonnel Douglas*" system of burden-shifting, named for *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973). Each of Carroll's first three counts is subject to some version of *McDonnell Douglas*, with variations depending on the particular subject matter. *See v. Quad/Graphics Printing Corp.*, 749 F.3d 530, 536 (6th Cir. 2014) (ADEA); *Blazek v. City of Lakewood, Ohio*, 576 F. App'x 512, 516 (6th Cir. 2014) (ADA); *Jones-McNamara v. Holzer Health Sys.*, 630 F. App'x 394, 398 (6th Cir. 2015) (FCA retaliation).

Under the *McDonnell Douglas* framework, the plaintiff must first establish a *prima facie* case of discrimination or retaliation, the specific requirements of which depend on the cause of action under consideration. *See, e.g.*, *White v. Columbus Metro. Hous. Auth.*, 429 F.3d 232, 238

---

[4] In particular, the court notes that Carroll concedes that he is not asserting that he requested, but was denied, a workplace accommodation in violation of the ADA, *see Blanchet v. Charter Commc'ns, LLC*, 27 F.4th 1221, 1227 (6th Cir. 2022). (Doc. No. 76 at 20 n.8.)

20

(6th Cir. 2005). If the plaintiff makes the required *prima facie* showing, "the burden shifts to the defendant to proffer a legitimate, non-discriminatory [or non-retaliatory] reason for the employment decision at issue." *Id.* To meet this burden, the defendant must show that its reason is supported by admissible evidence. *Clay v. United Parcel Serv., Inc.*, 501 F.3d 695, 703–04 (6th Cir. 2007).

If the defendant is successful, the burden then "shifts back to the plaintiff to show that the defendant's proffered reason is a pretext for unlawful discrimination" or retaliation. *Bryson v. Regis Corp.*, 498 F.3d 561, 570 (6th Cir. 2007). To make this showing, the plaintiff must identify "sufficient evidence from which the jury could reasonably reject [the defendant's] explanation and infer that [the defendant] intentionally discriminated [or retaliated] against him." *Braithwaite v. Timken Co.*, 258 F.3d 488, 493–94 (6th Cir. 2001) (internal quotation marks omitted).

**B. *Prima Facie* Cases**

1. Count I (ADA)

A plaintiff can establish a *prima facie* case of disability discrimination by showing that that (1) he was disabled or believed to be disabled; (2) he was otherwise qualified for the job at issue, with or without a reasonable accommodation; (3) he suffered an adverse employment decision; (4) his employer knew or had reason to know of the employee's disability; and (5) similarly situated employees were treated more favorably, or, if the employee was terminated, he was replaced by a non-disabled individual. *Rosebrough v. Buckeye Valley High Sch.*, 582 F. App'x 647, 651 (6th Cir. 2014).

The evidence before the court in this case would clearly support a finding of elements (1), (3), and (4). The ADA's definition of "disability" reaches any "physical or mental impairment that substantially limits one or more major life activities of [an] individual," 42

U.S.C. § 12102, and Carroll's cancer treatments required him to engage in significant, disruptive travel, as well as caused periods of physical weakness that a reasonable jury could find to have interfered in major life activities. IDEMIA knew of his condition, and its termination of Carroll's employment was undoubtedly an adverse employment decision—which his reassignment to a position with reduced responsibilities arguably may have been as well. What remains, then, are the questions of whether Carroll was qualified and whether he was either replaced by a non-disabled individual and/or treated differently than a similarly situated non-disabled individual.

IDEMIA, citing the various performance issues that it has highlighted throughout this litigation, argues that Carroll was not qualified for his position. The *prima facie* case, however, is not focused on a holistic assessment of actual job performance, but rather simply whether the plaintiff possessed the "requisite skill, experience, education and other job-related requirements of the employment position" and could "perform the essential functions of such position." 29 C.F.R. § 1630.2(m). Carroll held high-level executive positions at IDEMIA for many years, during which he received frequent and significant praise from management. He was highly experienced in the field of biometric security, and even Casey, who eventually grew disillusioned with Carroll, had positive things to say about his vision and accomplishments. Indeed, before the relationship soured, Carroll tried to resign and Casey fought hard to keep him. Even if one were to believe all of the negative statements that individuals later made about Carroll, the picture one would draw would be of a qualified person who made mistakes—not of a person who was not qualified for the job.

IDEMIA argues next that, because Trusted Fan was ultimately abandoned and no other employee ever assumed Carroll's specific title, then he was not replaced by a non-disabled employee. A reasonable finder of fact, however, could conclude that Carroll was replaced by

22

Amlani. The evidence does not, in fact, show that Carroll's employment and the Trusted Fan program ended at the exact same time, and the internal drafts surrounding the announcement of Carroll's departure confirm that at least some in the company believed that Amlani was assuming Carroll's responsibilities. Carroll, therefore, has identified evidence sufficient to shift the burden to IDEMIA as to Count I.

### 2. Count II (ADEA)

The ADEA prohibits an employer from terminating an employee "because of such individual's age." 29 U.S.C. § 623(a)(1). To establish a *prima facie* case of age discrimination, the plaintiff must show that: (1) he was older than 40 years old; (2) he suffered an adverse employment action; (3) he was qualified for the position held; and (4) he was either replaced by a younger employee or similarly situated, younger employees were treated more favorably. *Owen v. GE Aviation*, No. 20-5177, 2021 WL 3624783, at *2 (6th Cir. Aug. 2, 2021) (citing *Tuttle v. Metro. Gov't of Nashville*, 474 F.3d 307, 317 (6th Cir. 2007)). It is undisputed that Carroll was in his 60s when these events occurred and that Amlani was significantly younger than Carroll. The facts that permitted Carroll to shift the *McDonnell Douglas* burden to IDEMIA with regard to Count I are, therefore, also sufficient to do so with regard to Count II.

### III. Count III (FCA Retaliation)

Retaliatory discharge claims under the FCA proceed under the same rules applicable to other employment-related retaliation claims, which means that a plaintiff seeking to establish a *prima facie* case "must show: (1) he engaged in a protected activity; (2) his employer knew that he engaged in the protected activity; and (3) his employer discharged or otherwise discriminated against the employee as a result of the protected activity." *Yuhasz v. Brush Wellman, Inc.*, 341 F.3d 559, 566 (6th Cir. 2003) (citing *McKenzie v. BellSouth Telecomms., Inc.*, 219 F.3d 508,

513–14 (6th Cir. 2000)). IDEMIA disputes each of those elements, arguing that Carroll did not engage in protected activity, IDEMIA had no knowledge of any such protected activity, and there is no causal nexus between the activity and any adverse action against Carroll. Carroll responds that he has produced evidence sufficient for a jury to find a causal nexus between his complaining about IDEMIA's contractual noncompliance and his reassignment and/or dismissal.

Because the FCA's anti-retaliation provision is specific to that statute, the underlying protected activity must be "in furtherance" of either an FCA action itself or "other efforts" directed at stopping an FCA violation—that is, stopping one of the various alternative types of fraud against the government outlawed by the Act. 31 U.S.C. § 3730(h)(1). The Supreme Court has held that a plaintiff can state a claim for retaliation under the FCA even if the target of the plaintiff's actions was not, in fact, in violation of the Act, if the plaintiff's belief that he was acting to combat a violation was reasonable and in good faith. *See Graham Cnty. Soil & Water Conservation Dist. v. U.S. ex rel. Wilson*, 545 U.S. 409, 416 & n.1 (2005) (collecting cases).

IDEMIA argues that Carroll could not have engaged in protected activity because nothing IDEMIA did could plausibly have violated the FCA. IDEMIA first points out that the structure of the UES and UES2 contracts meant that it never actually made claims for payment from the government for individual enrollments, but merely retained portions of fees. Because IDEMIA made no claims, it argues, it could not have made any false claims.

IDEMIA is correct that, as the FCA's name suggests, the statute was historically structured around the submission of "claims," which the Act, in its current form, defines to include "any request or demand . . . for money or property . . . that . . . (i) is presented to an officer, employee, or agent of the United States; or (ii) is made to a contractor, grantee, or other recipient, if the money or property is to be spent or used on the Government's behalf or to

advance a Government program or interest," with the caveat that certain additional requirements must be met for this second type of claim, made to an intermediary. 31 U.S.C. § 3729(b)(2). Congress, however, has been sensitive to the fact that government payment programs can take various forms, each of which is potentially vulnerable to its own particular types of fraud. To reflect that variation, Congress has repeatedly amended the FCA to set forth a number of different ways in which an individual or entity can incur liability, some of which do not expressly depend on the existence of a discrete "false claim" at all. Now, a person or company violates the Act if he

> (A) knowingly presents, or causes to be presented, a false or fraudulent claim for payment or approval; (B) knowingly makes, uses, or causes to be made or used, a false record or statement material to a false or fraudulent claim; (C) conspires to commit a violation of subparagraph (A), (B), (D), (E), (F), or (G); (D) has possession, custody, or control of property or money used, or to be used, by the Government and knowingly delivers, or causes to be delivered, less than all of that money or property; (E) is authorized to make or deliver a document certifying receipt of property or, or to be used, by the Government and, intending to defraud the Government, makes or delivers the receipt without completely knowing that the information on the receipt is true; (F) knowingly buys, or receives as a pledge of an obligation or debt, public property from an officer or employee of the Government, or a member of the Armed Forces, who lawfully may not sell or pledge property; or (G) knowingly makes, uses, or causes to be made or used, a false record or statement material to an obligation to pay or transmit money or property to the Government, or knowingly conceals or knowingly and improperly avoids or decreases an obligation to pay or transmit money or property to the Government . . . .

31 U.S.C. § 3729(a)(1).

Moreover, "falsity," as it is understood under the FCA, encompasses more than the kind of express misrepresentation of the truth that would occur when, for example, a party tells the government that it performed a service that it did not. Falsity can also encompass situations in which a communication to the government contains no express falsehood, but implies, in

context, that the submitting party complied with a material condition of the underlying transaction. *See Universal Health Servs., Inc. v. U.S. ex. Rel. Escobar*, 579 U.S. 176, 190 (2016).

A jury could probably conclude that Carroll had an earnest and reasonable belief that IDEMIA's chronic noncompliance with TSA and other federal requirements could have given rise to FCA violations. While IDEMIA may not have been regularly submitting conventional claims for payment to the TSA, it was nevertheless in ongoing communication with the agency. Those communications could plausibly have included a "false record or statement material to an obligation to pay or transmit money or property to the" TSA, 31 U.S.C. § 3729(a)(1)(G), in that they involved implied compliance or implied substantial compliance with certain contractual provisions, pursuant to which money was transmitted to the government. Insofar as Carroll actually did anything to oppose such violations, therefore, it may well have amounted to protected activity.

Ultimately, though, it is unnecessary to reach a definitive conclusion regarding the relationship between the FCA and IDEMIA's alleged noncompliance, because, even if one assumes that the company violated the FCA, there is little, if any, evidence that Carroll's purported efforts to stop those violations led to any action taken against him. For one thing, the evidence of Carroll's supposed protected activity itself is vague; there is evidence that Carroll complained about contractual noncompliance internally, but it is not clear exactly how he did so or whether any of those efforts differed substantially from the normal actions that any manager overseeing a large government contract would be expected to undertake. Indeed, it would be unusual if an individual in Carroll's position *did not* make efforts to resolve noncompliance. That was his job. Carroll has identified no evidence that Casey or anyone at IDEMIA was particularly unhappy with him about these issues, and there is a great deal of evidence regarding conflicts

26

between Carroll and the company on numerous other topics. There is also no evidence that Carroll's alleged agitation about noncompliance increased or became particularly striking in the time leading up to his termination; to the contrary, by that point, he was not even working on government contracts at all.[5]

Carroll, accordingly, has failed to establish a causal nexus between his potentially protected activities and any adverse employment action and he has, therefore, failed to shift the *McDonnell Douglas* burden to IDEMIA with regard to Count III.

## C. Legitimate Nondiscriminatory Reason/Pretext

IDEMIA argues that its initial decision to terminate Carroll was due to his mismanagement of Trusted Fan—a rationale that was later supplemented, after the decision itself had been made, by the alleged wrongdoing that the company discovered when it began looking into Carroll's broader actions and behavior. There is no dispute that poor management of an important portion of a company's business would be a legitimate reason to take an adverse action against an executive, and IDEMIA has produced some evidence that that is what happened in this insance. The burden, therefore, shifts to the Carroll to show that IDEMIA's proffered reasons are "actually a pretext to hide unlawful discrimination." *Briggs v. Univ. of Cincinnati*, 11 F.4th 498, 515 (6th Cir. 2021) (quoting *Rogers v. Henry Ford Health Sys.*, 897 F.3d 763, 777 (6th Cir. 2018)).

"At the summary judgment stage, a plaintiff meets this burden when he 'produce[s] evidence sufficient that a reasonable finder of fact could reject the employer's proffered reason.'" *Id.* (quoting *Rogers*, 897 F.3d at 777). "Plaintiffs ordinarily show pretext by showing

---

[5] Even if one allows Carroll to rely on his reassignment, rather than his termination, as the relevant adverse action, this claim fares no better. Carroll has expressly conceded that Casey genuinely believed that IDEMIA's government business should be consolidated and that Trusted Fan would benefit from dedicated leadership. Carroll, moreover, was given the option to continue working with the TSA, which belies any suggestion that he was reassigned to put an end to his efforts to address noncompliance.

that the proffered reason[] (1) had no basis in fact; (2) was insufficient motivation for the employment action; or (3) did not actually motivate the adverse employment action." *Id.* (citations and internal quotation marks omitted). "Pretext is a commonsense inquiry: did the employer fire the employee for the stated reason or not?" *Blizzard v. Marion Tech. Coll.*, 698 F.3d 275, 285 (6th Cir. 2012) (quoting *Chen v. Dow Chem. Co.*, 580 F.3d 394, 400 n.4 (6th Cir. 2009)). In order "to survive summary judgment, a plaintiff need only produce enough evidence to support a *prima facie* case and to rebut, but not to disprove, the defendant's proffered rationale." *Griffin v. Finkbeiner*, 689 F.3d 584, 593 (6th Cir. 2012).

Carroll has devoted a great deal of his briefing on this subject to arguing, in essence, that firing him for the failure of Trusted Fan was unfair, because the program's shortcomings were not his fault. He complains, in particular, about IDEMIA's forcing him to use Digital Labs and the company's failure to provide him with sufficient staffing. If this were a lawsuit about who was to blame for the troubles of Trusted Fan, those issues might be the core of the case. Because this case is about alleged discrimination and/or retaliation, however, the court's inquiry is decidedly narrowed. The relevant question is not whether IDEMIA was wise to fire Carroll for his performance, but whether it did so at all, as opposed to firing him for one of the improper reasons specifically proscribed by the ADA, ADEA, or FCA.

Because the key issue under the *McDonnell Douglas* is pretext—not correctness or fairness, in and of themselves—courts evaluate proffered reasons for employment actions pursuant to what is sometimes referred to as the "honest belief" rule, which provides that an employer who "honestly, but mistakenly, believes in the proffered reason given for the [employment] decision at issue" can rely on that earnestly held rationale, even if it is later shown to have been mistaken. *Philbrick v. Holder*, 583 F. App'x 478, 487 (6th Cir. 2014) (quoting

*Smith v. Chrysler Corp.*, 155 F.3d 799, 806 (6th Cir. 1998)). The fact that this approach is sometimes referred to as a "rule" in its own right should not distract from the fact that it is, at its root, not an independent principle, but simply a faithful application of the pretext-focused approach embodied in *McDonnell Douglas*. If, for example, IDEMIA honestly, but incorrectly, believed that Carroll did a bad job managing Trusted Fan and fired him solely based on that mistaken belief, then the company may have acted in an unfair and unwise manner, but it did not fire him for a discriminatory or retaliatory reason, which is the only question *McDonnell Douglas* calls on the court to answer.

That does not mean that the correctness of the employer's proffered reason for an employment action is irrelevant—particularly in a case, such as this one, in which a major, important employee was terminated. Carroll was a key part of IDEMIA, having shepherded its lucrative UES contract and overseen the development of a product that, the company hoped, would play a crucial role in the company's long term growth. The decision to fire him, then, was likely a considered one, which IDEMIA does not dispute. It is, therefore, relatively implausible that IDEMIA would have made such a decision based on a flimsy or obviously mistaken rationale. In recognition of this real, albeit incomplete, relationship between a rationale's factual basis and its legitimacy, courts have typically held that, "to establish an honestly held belief, the employer must produce evidence that it made a 'reasonably informed and considered decision.'" *Id.* (quoting *Smith*, 155 F.3d at 807). In situations where the "asserted business judgment is so 'ridden with error' that the employer could not have honestly relied on it, pretext may be shown." *Id.* (quoting *In re Lewis*, 845 F.2d 624, 633 (6th Cir. 1988) (other citations omitted).

None of Carroll's criticisms of IDEMIA's rationale, however, rises to that level. In fact, if anything, the amount of Carroll's briefing and evidence that he has devoted to relitigating

29

disagreements surrounding Trusted Fan bolsters, rather than undermines, IDEMIA's asserted reason for his dismissal. For example, Carroll repeatedly complains that IDEMIA's reliance on Digital Labs was foolish and that Digital Labs mishandled the project. Insofar as that is true, though, it merely confirms that Trusted Fan—for which Carroll was uniquely responsible—was, as IDEMIA insists, deeply troubled. Indeed, Carroll agrees that it was troubled—so troubled that the company, he admits, was quite right to be concerned. The evidence, moreover, is overwhelming that IDEMIA wanted Trusted Fan to succeed and was, in fact, eager for the product to demonstrate its viability. Carroll's focus on IDEMIA's mishandling of Trusted Fan, then, looks conspicuously like an explanation of why the company might conclude that the executive in charge of Trusted Fan—Carroll—would need to be fired.

The same issues arise with regard to Carroll's repeated complaints that he was not personally responsible for the overly sunny financial projections that IDEMIA embraced with regard to Trusted Fan. As with Digital Labs, it may well be true that Carroll, in some sense, has been made a scapegoat. But, if so, he was made the scapegoat for the failure of his own pet product—consistently with the straightforward rule that the buck stops with the person at the top. In the absence of evidence that the entire Trusted Fan fiasco was somehow orchestrated to force Carroll out based on his age or disability, what one is left with is the apparently agreed-upon fact that the product that Carroll was overseeing faced sizable expectations, which it failed to meet, after which Carroll was fired. Maybe the firing was justified, or maybe Casey foisted blame on Carroll in order to protect himself. In neither plausible scenario, however, was anything done to Carroll based on his age or disability.

The primary evidence to the contrary that Carroll has presented is the fact that Casey often discussed Carroll's illness with him and has admitted to having had concerns about the

possibility of disruption of work in the event that Carroll's condition worsened or his treatments became more taxing. Nothing about the ADA, however, requires an employer to ignore the inconvenience associated with disability-related employee absences. *See* 42 U.S.C. § 12112(d)(4) (forbidding some employer inquiries regarding employee health but permitting inquiries "shown to be job-related and consistent with business necessity"); 29 C.F.R. § 1630.14 (describing permissible employer inquiries regarding an employee's ability to perform the functions of his job, in the context of his disability). To the contrary, the reasonable accommodation framework, if anything, encourages employers to consider, not ignore, an employee's disability-related needs and work around them—which IDEMIA did by allowing Carroll to work remotely.

Carroll also points to the fact that he was terminated shortly after he mentioned to Casey that he was seeking treatment at MD Anderson, which was itself not long after Carroll's experimental treatments in Germany. Carroll suggests that Casey may have interpreted those facts as demonstrating the severity of Carroll's condition, prompting a discriminatory response. This reading, however, is significantly undermined by the fact that Carroll had dealt with cancer for a number of years, during some of which Casey and Carroll, by Carroll's own admission, discussed Carroll's health multiple times. There is, therefore, nothing remarkable about the fact that they had such a discussion around the time Carroll was terminated, nor is it plausible to think that Casey only realized, that late in the process, that Carroll's cancer was potentially serious. The assertion that the evidence shows anything more is based entirely on Carroll's own speculation.

The evidence of discrimination based on age in this case is even thinner, consisting almost entirely of Carroll's own reading of sinister intentions into a handful of stray remarks.

31

Carroll notes that Casey protested, at one point, that he was not "putting [Carroll] out to pasture," suggesting a sensitivity to Carroll's age. (Doc. No. 90 ¶ 45.) IDEMIA also concedes, for the purposes of summary judgment, that Casey asked Carroll why he continued to be driven to take on so many responsibilities at his age—which was similar to Casey's own. Finally, Carroll points to evidence that various IDEMIA executives were aware, broadly speaking, of the company's "aging workforce." (Doc. No. 76 at 27.) Such isolated, ambiguous remarks would not be sufficient to allow a reasonable finder of fact to disregard the significant body of evidence showing that IDEMIA trusted Carroll with key, important responsibilities and, in fact, practically begged him to remain with the company when he threatened to quit, allowing him to drag IDEMIA through a lengthy negotiation process that resulted in a sizable salary and the power to oversee a product about which he was passionate

In the face of this general lack of evidence of improper motive, Carroll repeatedly cites his highly positive 2018 performance review to suggest that it is implausible that he was later fired for poor performance. That positive review, however, clearly reflects the major victory that the company attained in winning the bid for the UES2 contract. IDEMIA has not disputed that obtaining that contract was an important milestone for which Carroll deserved at least some credit—even if Carroll's management of the bid process was, as IDEMIA argues, rockier than the final result might suggest. Trusted Fan, however, was an entirely different product, and it— not UES2—was what Carroll has actually been accused of mismanaging. There is nothing remarkable about an employee's receiving praise for one matter but later being fired for mishandling another.

Finally, Carroll points to the fact that he was not subject to progressive discipline or a performance improvement plan prior to his termination. IDEMIA's response that such an

approach would have been a poor fit for an executive of Carroll's stature, however, makes a great deal of sense. Moreover, it is worth noting that Carroll's termination came not long after the drawn out negotiation period regarding his change in duties and reflected Casey's preexisting desire to replace the leadership team that he inherited. Carroll's position within the company was, in other words, clearly on the table for most of the relevant period, even if it was not being considered pursuant to the standard procedures used for lower-ranking employees.

Based on the foregoing, no reasonable jury could conclude that Carroll was terminated or reassigned, either wholly or in part, based on his age, disability, or efforts related to the FCA. A jury might conclude that Carroll was fired because he seriously mismanaged Trusted Fan. A different jury might conclude that he was fired because Trusted Fan, for which he was formally responsible, failed in the face of headwinds beyond his control. The overwhelming evidence, however, is that it was the failure of Carroll's signature project that resulted in his ouster. The court, therefore, will grant summary judgment as to the first three counts.

## D. Count IV (Breach of Contract)

A claim for breach of contract has three essential elements: (1) the existence of an enforceable contract; (2) nonperformance amounting to a breach of that contract and (3) damages caused by the breach of contract. *Ingram v. Cendant Mobility Fin. Corp.*, 215 S.W.3d 367, 374 (Tenn. Ct. App. 2006). Carroll's briefing addresses this claim only briefly, arguing that IDEMIA breached its contract with him by failing to pay him 26 weeks of salary upon his termination. (Doc. No. 76 at 28–29.)

As IDEMIA points out, however, Carroll has conceded that he would not be entitled to such payment if he was terminated for "issues of performance." (Doc. No. 1 ¶ 152.) For the reasons that the court has explained, no reasonable juror could conclude that Carroll was

33

dismissed for any reason other than performance. It may be that that performance was judged more harshly than it should have been, given the difficult position IDEMIA placed him in with Trusted Fan. That, however, does not change the fact that he was terminated because the product he was in charge of failed. The court, accordingly, will grant IDEMIA summary judgment in full and will deny the other pending motions as moot.

### IV. CONCLUSION

For the foregoing reasons, IDEMIA's Motion for Summary Judgment (Doc. No. 56) will be granted, and IDEMIA's Motion for Hearing (Doc. No. 61) and Carroll's Motion in Limine (Doc. No. 81) will be denied as moot.

An appropriate order will enter.

_____
ALETA A. TRAUGER
United States District Judge